Commonwealth *v.* Berlo Vending Company, Appellant.

Argued April 27, 1964. Before BELL, C. J., JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Harry J. Rubin,* with him *Ralph S. Snyder,* and *Schnader, Harrison, Segal & Lewis,* and *Krekstein and Rubin,* for appellant.

*Edward T. Baker,* Deputy Attorney General, with him *Walter E. Alessandroni,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, July 1, 1964:

Berlo Vending Company appeals from the judgment of the Court of Common Pleas of Dauphin County disallowing both the manufacturing[1] and the processing[2] exemptions to which Berlo claims to be en-

---

[1] Capital Stock Tax Act of June 1, 1889, P. L. 420, §21(b), as amended by Act of March 15, 1956, P. L. (1955) 1285, §1, as amended, 72 P.S. §1871(b) (Supp. 1963).

[2] Capital Stock Tax Act of June 1, 1889, P. L. 420, §21(b), (c), added by Act of August 23, 1961, P. L. 1100, §1, as amended, 72 P.S. §1871(b), (c) (Supp. 1963). This provision is retroactive to 1958.

titled in the computation of its corporate franchise tax for 1958.

Berlo produces popcorn, the great bulk of which is sold by Berlo in motion picture theaters, drive-in theaters and similar places of entertainment. The company obtains leases from the theaters, constructs showcases, hires sales personnel, and stocks these "concessions" with the popcorn it produces.

The ingredients for popcorn are coconut oil, salt and popping corn. The oil is preheated to 80 degrees fahrenheit, and eight ounces is poured into a popcorn kettle. Berlo's plants have banks of popping kettles, each of which is about 16 inches in diameter and 16 inches high. Between 28 and 30 ounces of corn and 2 ounces of salt are placed into a kettle with the oil. When the corn-oil-salt mixture reaches about 450 degrees, the moisture in the corn turns to steam and "explodes" the corn, thus increasing the volume of each kernel from 30 to 36 times its original size. The process requires constant agitation of the mixture to prevent scorching. As a kettle slowly fills to overflow, its hinged top opens and the popped corn is expelled. The popped corn falls on a conveyor belt and is separated into waste and merchantable corn by passing through a perforated drum.

The finished product is put into five pound polyethylene bags which are sealed with a piece of wire which produces an air-tight seal. Occasionally, heavy paper bags are used; these are also airtight. The containers are then transferred, as soon as possible, to Berlo's concessions in trucks owned by the company.

The containers are stored at the concessions and later emptied into warmers owned by Berlo and maintained at the concessions. Consumers purchase the popcorn at the concession stands in containers of various sizes and prices. The customer is served by an empoyee of Berlo.

104

Appellant and its property are within the general language of the Act which imposes the corporate franchise tax. Accordingly, the provisions relied upon to establish the claimed exemptions must be strictly construed. *Commonwealth v. Sitkin's Junk Co.*, 412 Pa. 132, 141-42, 194 A. 2d 199, 204 (1963). We agree with the learned court below that appellant has not sustained its burden of establishing a clear right to an exemption.

The meaning of "manufacturing" has been restated by this Court in *Philadelphia School District v. Parent Metal Products, Inc.*, 402 Pa. 361, 364, 167 A. 2d 257, 258-59 (1961): " 'Manufacturing' as used in a legislative enactment is given its ordinary and general meaning. It consists in the application of labor or skill to material whereby the original article is changed into a new, different and useful article: Commonwealth v. Weiland Packing Company, 292 Pa. 447, 449, 141 Atl. 148 (1928); Pittsburgh v. Electric Welding Co., 394 Pa. 60, 145 A. 2d 528 (1958). Whether or not an article is a manufactured product depends upon whether or not it has gone through a substantial transformation in form, qualitites and adaptability in use from the original material, so that a new article or creation has emerged: General Foods Corp. v. Pittsburgh, 383 Pa. 244, 118 A. 2d 572 (1955). If there is merely a superficial change in the original materials, without any substantial and well signalized transformation in form, qualities and adaptability in use, it is not a new article or new production: Commonwealth v. Weiland, supra; Pittsburgh v. Electric Welding Co., supra."

On the same day as the decision in *Parent Metal Products Co.*, we also decided *Philadelphia School District v. Rosenberg*, 402 Pa. 365, 368, 167 A. 2d 259, 260 (1961), in which we emphasized that "it is the popular or practical understanding of what is 'manufacturing' that prevails and is intended."

The court below correctly observed: "Here, although there is a change in form, the kernel of corn is expanded to many times its original size and with the addition of some oil and salt, such change is merely superficial. . . .

". . . [T]he production of popcorn, even though on an expanded scale, should not achieve the status of manufacturing as that term is popularly considered. The popping of corn does not require any specific skill or elaborate machinery. It can be done in the home by a child in a smaller scope in the same manner as appellant accomplishes in its plant. There is no application of labor, skill, art or science to provide a well signalized change as those terms are known. There can be little doubt that the courts have required a certain degree of skill, art or science be employed. [Citing cases.]

"Nor has cooking, in any sense of the word, been considered manufacturing in the ordinary and popular sense of the word. In Commonwealth v. Lowry-Rodgers Co., supra [279 Pa. 361, 123 Atl. 855 (1924)], at page 367, it is held: '. . . In each and all of these matters, "in the popular, and therefore in the statutory, sense of the word," it is probable that few, if any, people would say that the process of cooking is in fact manufacturing, and hence it is not within the meaning of that word in the Acts of 1846 and 1864.'

"The act of popping corn is a pastime in which anyone can indulge. Therefore, it cannot be said that such activity is manufacturing as that term is thought of in everyday parlance."

Appellant contends that there is no distinction between the production of potato chips and of popcorn and, therefore, urges that it is entitled to the manufacturing exemption by virtue of this Court's decision in *Commonwealth v. Snyder's Bakery*, 348 Pa. 308, 35 A. 2d 260 (1944). We cannot agree. While

the court below expressed doubt as to the current validity of the *Snyder's Bakery* case, we need express no view as to that observation. It is quite clear that the production of popcorn involves far less control factors, skill and science than does the production of potato chips.[3] Thus, the production of popcorn is of such a nature that it cannot be termed "manufacturing" which would entitle appellant to the claimed exemption.

Appellant urges, in the alternative, that it is entitled to an exemption as a "processor." The Act defines "processing" in Section 21(c): "The term processing, as used in this section, shall mean and be limited to the following activities when engaged in as a business enterprise: (1) The cooking or freezing of fruits, vegetables, mushrooms, fish, seafood, meats or poultry, when the person engaged in such business packages such property in sealed containers *for wholesale distribution.* . . ." (Emphasis added.)

---

[3] The production of potato chips was described in *Commonwealth v. Snyder's Bakery*, 348 Pa. 308, 309, 35 A. 2d 260 (1944), as follows: "Only a particular type of potato adaptable for this particular product is used. Potatoes are stored over a long period of time at a constant temperature between 40 and 50 degrees during which time a chemical change takes place, the starch content being changed to a sugar content. The temperature is then increased to 60 or 70 degrees, during which time tests are made to determine the proper relationship between the starch and sugar content. When the proper relationship has been reached the potatoes are prepared for making chips. After passing through various processes, during which the potatoes are cleaned, sliced and washed, they are dried thoroughly and delivered to a chipping or frying machine. They first come in contact with a temperature of 450 to 475 degrees and leave the machine at a temperature of 300 to 325 degrees. This machine contains hot fat and vegetable oils through which the chips are passed. They are then conveyed through an oven which drains off the fat and dries them. After further drying they pass through an automatic salting machine and are conveyed to an automatic packing machine from which the chips emerge packed and ready for shipment."

Appellant contends that because it is engaged in widespread quantity distribution of popcorn, it is engaged in "wholesale distribution."

Quantity is not, in itself, the factor which determines the nature of a sale. The principle which governs is ". . . that the determination of whether a transaction is wholesale or retail should be made by reference to what the buyer does with the product. . . ." *Kerchner, Marshall & Co. v. Pittsburgh,* 406 Pa. 158, 161, 176 A. 2d 645, 647 (1962).

On the record before us, it is clear that appellant sells its product directly to the ultimate consumer through its own concessions leased and maintained by it and staffed by its own employees. It is obvious beyond doubt that sales of popcorn by Berlo to moviegoers and others at its concessions are sales at retail. See *Kerchner, Marshall & Co. v. Pittsburgh,* supra; *Paper Products Co. v. Pittsburgh,* 391 Pa. 87, 137 A. 2d 253 (1958).

Appellant is not entitled to the processing exemption.[4]

Judgment affirmed.

---

[4] Appellant urged here and in the court below that Ruling 274 promulgated by the Department of Revenue entitles it to the processing exemption. The court below correctly concluded that because the ruling had never been approved by the Department of Justice pursuant to the Administrative Agency Law, June 4, 1945, P. L. 1388, §21, as amended, 71 P.S. §1710.21 (Supp. 1963), it was entitled to little, if any, consideration.

Most important, we have held that such rulings are in no way binding upon the courts when they are not in accord with the governing statutes under which they are promulgated. *Commonwealth v. American Ice Co.,* 406 Pa. 322, 332, 178 A. 2d 768, 773 (1962).