## Commonwealth *v.* Tetley Tea Company, Inc., Appellant.

Argued May 25, 1966. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Robert L. Trescher,* with him *Gerald A. Gleeson, Jr.,* and *Montgomery, McCracken, Walker & Rhoads,* for appellant.

*Vincent X. Yakowicz,* Deputy Attorney General, with him *Walter E. Alessandroni,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE COHEN, June 24, 1966:

This appeal is taken from the judgment of the lower court which sustained the imposition of franchise tax on the Tetley Tea Company.

The Act of 1889, P. L. 420, as amended, imposes on certain foreign corporations a franchise tax computed as set forth in the Act. Inter alia, a company "organized for manufacturing" receives an exemption to the extent its property is used in, its employees are engaged in and its receipts are incident to manufacturing in Pennsylvania. Act of June 1, 1889, P. L. 420, §21, as amended, 72 P.S. §1871.

Tetley is a New York corporation maintaining facilities in Pennsylvania for the blending of tea, the

filling of tea bags and the distribution and sale of its product. Arguing that the company is engaged in manufacturing within the meaning of the aforesaid provision, Tetley claims an exemption from the tax. Even though it has been stipulated that Tetley's certificate of incorporation states that one of the purposes of the company is to manufacture tea, it remains to be determined, however, whether the activity conducted by Tetley is, in fact, manufacturing so as to permit the exclusion of the property values, wages and receipts in computing its tax.

We have defined "manufacturing" to be the application of skill and labor to materials so that there results a new, different and useful product. *Philadelphia School District v. Parent Metal Products, Inc.*, 402 Pa. 361, 167 A. 2d 257 (1961). To be new and different the manufacturing process must have substantially transformed the ingredients in form, quality and use. *Commonwealth v. Berlo Vending Company*, 415 Pa. 101, 202 A. 2d 94 (1964); *Commonwealth v. Peerless Paper Specialty, Inc.*, 344 Pa. 283, 25 A. 2d 323 (1942).

At its plant, Tetley separates the tea from foreign matter, blends the tea and places precisely measured amounts in bags. The bags are composed of paper specially treated to impart a heat-sealing characteristic and to withstand boiling water. Intricate machinery is required to fold, fill, seal and attach string and tags to the bags. The mechanics who service the machinery must be specially trained.

The process results in a bag of tea that is dipped into a container of boiling water. No teapot or strainer is required to prevent the tea leaves from remaining in the cup. The bag permits of easy disposal, enables the tea to be precisely measured for each cup and may even improve the flavor by maintaining an exact blending.

All this, however, does not make it a "new and different" product. The process starts and ends with tea. The use to which the loose tea can be put is basically no different from that which can be made of the endproduct. Mere convenience, leading to a greater and wider appeal for a product, does not make the process by which that convenience is achieved manufacturing within the purview of the statute. See, also, *Commonwealth v. Lowry-Rodgers Co.*, 279 Pa. 361, 123 Atl. 855 (1924).

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion says that the business of the Tetley Tea Company cannot be considered manufacturing because its operations "starts and ends with tea." If this were the sole criterion for determining whether the production of an article constitutes manufacturing, there would be little manufacturing in America. Wooden furniture begins and ends with wood, but who can say that tables, chairs, dressers, bureaus, cabinets and desks are not the result of manufacturing? Knives, pots, pans, casseroles, skillets and all the kitchen armament begin with steel and end with steel but are they not the result of manufacture? Suits, dresses and overcoats begin with cloth and end up as cloth. Does that make the wearers lilies of the field, neither having been toiled on or spun?

The Majority has over-simplified the issue in this case. It has taken a couple of grains of an idea, dipped them into a couple pages of print, stirred them and poured out a weak tea which scarcely qualifies as authority.

Over the years the decisions of this Court have evolved a series of tests which are to be applied in determining whether a certain process constitutes manufacture under the Capital Stock Tax Act of June 1,

1889, P. L. 420, as amended by the Act of March 15, 1956, P. L. (1955) 1285, 72 P.S. §1871(b). These tests have been well epitomized by the appellants as follows: (1) Is the corporation organized for manufacturing? (2) Is the product made in a mechanical sense? (3) Does the production require the use of specialized machinery and plant facilities? (4) Does it require a large capital investment? (5) Does it require the use of care, skill and labor? (6) Does the new product sell at a higher price than its component parts sold separately? (7) Is the product new and different, with a distinctive name, character and use, and with a new shape and new qualities, which according to common usage and custom would be the product of an activity popularly regarded as manufacturing.

The record in this case abundantly answers each one of these tests in the affirmative. The Tetley Tea Company's certificate of authority to do business in Pennsylvania specifically states that manufacturing is one of the corporation's purposes.

Is Tetley's product the result of a mechanical activity? How could one doubt it? Tea comes into the appellant's plant in large bulk. It is sifted, cleaned and screened, and placed in large drums where mechanism revolves it into a blend. Belts now convey the blended tea to overhead hoppers.

In the meanwhile small bags have been made from specially treated paper. The paper must be porous enough to allow water to swish through it and yet strong enough to prevent its disintegration in the liquid heat in which it is immersed. The paper must be permeable enough to let the juices out and yet firm enough to retain the tea grains so that the drinker will not be spitting them out like watermelon seeds. The operation is described: "The heat-sealing paper is fed into the machine from two rolls which are fixed to the top of the machine. The paper on each roll is pre-cut

by the producer to approximately double the width of a tea bag. The small strip then encounters an attachment which folds the strip in the middle. As the folded paper feeds farther into the machine, it is automatically measured and cut into the appropriate length. The folded strip is carried through the machine and two of the three open sides are then heat-sealed by the application of high temperature and pressure. At this point, the tea bag is open on one side and sealed on the other two sides."

"The tea is then injected into the bag by a volumetric control, each bag containing one two-hundredths of a pound. The volumetric control equipment includes an adjustment device so that corrections can be made if either too much or too little tea is fed into the bags. One person is assigned to make frequent spot checks on the weight of the tea in the bags and to make adjustments, if necessary. The weighing devices are sensitized to the point of showing deviations of less than one per cent (1%) of the weight of a single tea bag, and the machine can be adjusted accordingly."

Another mechanical device grips the individual small envelopes, trims them and moves them to still other machinery: ". . . each bag has a string and tag attached by means of a tagging and stapling machine. Necessary supplies for the stapling and tagging include cones of thread, rolls of tags (printed by Tetley in its own plant) and spools of wire. The machine cuts the wire into lengths suitable for stapling and automatically measures and cuts the thread into proper lengths. The machine then automatically staples one end of the thread to the bag and automatically staples the tag to the other end of the thread. The bag complete with the tag stapled thereto is thereafter carried to a delivery chute for the purpose of packaging by machinery."

All this so that the tired housewife, the weary business man, the harried lawyer, and the tormented as well as overburdened judge may pick up a tea bag, dip it into a cup of boiling water, stir and quaff the delicious beverage which soothes the frayed nerves, quiets the tensions, refreshes the inner being and prepares the drinker to take up that portion of the load of responsibility which the world assigns to every man, woman and child on this planet.

That tea bag production requires the use of specialized machinery was amply demonstrated at the hearing in the court below, particularly by the photographs introduced as evidence.

The Majority Opinion says that all Tetley does is to blend tea, fill tea bags and sell them. If the appellant's business were as simple as that, it would not have to invest, as it has, $60,000 for screening machines and $1,617,000 for tea bag machines. If the process of putting tea into tea bags were as uncomplicated as described in the Majority Opinion, tea bags should not sell for a much higher price than loose tea, but it does. The average selling price of a pound of loose tea is $1.39; the average selling price of tea bags is $2.20. The difference in price is, of course, due to the expensive and heavy machinery which goes into the process, plus the price of labor to run the machinery.

Our decisions, as the Majority Opinion correctly says, have defined "manufacturing" to be the application of skill and labor to materials so that there results a new, different and useful product, and to be new and different the process must have substantially transformed the ingredients in form, quality and use. This does not mean, however, that what goes in as tea must come out as molasses. It can still be a manufacturing process if the tea undergoes mechanical treatment so that it is still tea but is transformed into something which will not be confused with the raw product.

For instance, no one could gainsay that potato chips, essentially, are still potatoes. Yet no one could confuse a raw tuber with the delicate wafers which are consumed to generate a thirst, enuring to the monetary advantage of the cocktail dispenser. Well, the making of potato chips, which begins and ends with potatoes, has been declared a manufacturing process—and for good reason. (*Commonwealth v. Snyder's Bakery*, 348 Pa. 308.)

Simple, unadorned, uncomplicated, open-faced and devoid of guile as a potato chip is, much has gone into preparing it for its appearance on luncheon plates, in cocktail bars, and in lunch bags. The description of how a potato becomes potato chips—the machinery employed, the evolution of chemical values, the varying temperatures the raw ingredients pass through—as told in the State Reports (348 Pa. 309), cannot help but build up in the reader an admiration for the potato chip which might never have occurred to him before. If the peeling, slicing, chipping, treating, and frying of potato sections which now become denominated potato chips is recognized in the law as a manufacturing process, which it is, then the transformation of raw tea, through the mechanical processes of separating, cleaning, blending, and placing into individual small envelopes is also manufacturing.

In *Edwin Bell Cooperage v. Pittsburgh,* 177 Pa. Superior Ct. 567, the Superior Court held that the assembling of staves, together with hoops, rivets and staples, into barrels constituted manufacturing.

It is a mistake to assume that tea bags are merely containers in which tea is sold. At the hearing in the Court below the Commonwealth argued that a tea bag is no different from a package of sugar, a paper-covered lollipop, or a box of detergent. E. C. Parker, President of Tetley, explained, and cogently so, that the three items presented by the Commonwealth could not

be compared with tea bags for the reason that the packages containing sugar, lollipop, and detergent were merely to protect the contents and were discarded once the contents were emptied therefrom. However, the tea bag was an integral part of Tetley's product and an indispensable factor in its use.

In conclusion I would say, as I said before, that the Majority Opinion has over-simplified the issue in this case and consequently has come out with the wrong answer. In a word, I would say that the Majority Opinion is not my cup of tea, and I dissent.