Morrisville Scrap Processing Company, Inc.
Tax Appeal.

Argued May 4, 1972, before Judges CRUMLISH, JR.,
KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.
President Judge BOWMAN did not participate.

*Lewis H. Markowitz* and *Howard Gould,* with them *F. Joseph Larkin, Markowitz, Kagen & Griffith* and *Gould, Reichert & Strauss,* for appellant.

*Edward T. Baker,* Deputy Attorney General, for appellee.

OPINION BY JUDGE ROGERS, July 12, 1972:

In this case, a dealer in scrap metal seeks a decision that it is engaged in manufacturing and therefore exempt from capital stock taxation, under the Capital Stock Tax Act, Act of June 1, 1889, P. L. 420, as amended, 72 P.S. 1871.[1]

The Commonwealth assessed the capital stock tax against the appellant for its fiscal year ending September 30, 1969, although the Act provided that it should ". . . not apply to the taxation of the capital stock of corporations . . . which is invested in and actually and exclusively employed in carrying on manufacturing . . . within the State. . . ." The appellant contends that its capital stock is actually and exclusively employed in carrying on manufacturing. Although the decided cases are against its position, appellant claims that the record made by it, unlike those of earlier cases, contains such "technical and metallurgical testimony" and evidence of "chemical changes" to the scrap under the appellant's ministrations as should convince us that a result different from that previously reached should here obtain.

---

[1] The cited Act was repealed and replaced by Article VI of The Tax Reform Code of 1971, Act of March 4, 1971, P. L.    , 72 P.S. §§7101 to 8203. The new legislation does not provide for the manufacturing exemption which is the subject of this case.

We make the following findings of fact:

1. The appellant is a Pennsylvania corporation and during its fiscal year here in question was engaged in the scrap metal business.

2. Appellant's plant is at Morrisville, Pennsylvania, near the Fairless Works of the United States Steel Company.

3. Appellant collects scrap metal from the following sources: junk automobiles from auto wreckers; so-called "home scrap" from the steel mills, being the croppings from billets or ingots, improperly rolled sheets, and discarded pipe, beams and other items; trimmings from automobile stamping plants; and punchings from fabricators of plates and beams.

4. The appellant removes the nonferrous materials from junk automobiles including copper, brass, wire, seats, rubber, aluminum, the motors and any other die cast materials.

5. Appellant separates the ferrous metals obtained from the several sources mentioned into approximately ten or twelve so-called grades of scrap useful in the steel-making business. The United States Steel Corporation, the appellant's principal customer, supplies specifications for the several grades, some for use in their open hearth furnaces and some for use in the newer electric furnaces.

6. Although the separation by the appellant of types of scrap is essential for use in the steel mills, nothing tangible is added to the scrap by the appellant. Although the separating operation requires some skill, the classification descriptions supplied by the mills are not highly technical.

7. After having separated the scrap the appellant cuts and shapes some into bundles of size and density suitable to be inserted into the steel manufacturers' furnaces. This it performs by means of huge and cost-

ly hydraulically operated presses and shears. Some of the scrap requires only cutting to lengths suitable for insertion into the furnaces.

8. While the pressing operation engaged in by the appellant produces heat, the only effect of the heat is to soften the scrap so that it may compact to a greater extent. Neither the heat produced in the compacting operation nor any other thing done by the appellant produces a chemical change in the scrap metal.

9. The pressing operation causes the elimination of the open spaces in the material, so that it becomes more like a solid piece of steel. In this sense only it makes the materials more dense.

10. If scrap material is not compacted or is insufficiently compacted when placed into the steelmaker's furnace, it either changes to iron oxide and becomes part of the slag layer of the furnace or, in the case of an electric furnace, requires more frequent back charging of the furnace with accompanying reduction of productivity. Therefore, the denser the bundles can be made, the more valuable they are to the steel mill.

11. The scrap as it comes to appellant's plant is potentially but not actually valuable; after the separating, shearing and compressing operations performed upon it by the appellant it is a commercially valuable product.

DISCUSSION

The word "manufacturing," when employed in a statute or other taxing measure without further definition, consists in the application of labor and skill to material whereby the original article is changed into a new, different and useful article. Whether or not an article is a manufactured product depends on whether it has gone through a substantial transformation in form, qualities and adaptability in use from the original so that a new article or creation has emerged.

*Commonwealth v. Weiland Packing Co.,* 292 Pa. 447, 141 A. 148 (1928) ; *Commonwealth v. McCrady-Rodgers Co.,* 316 Pa. 155, 174 A. 395 (1934).

The Berlo Vending Company preheated coconut oil, poured it into kettles, added corn and salt, and turned up the heat, which latter when it reached 450 degrees caused the corn to explode and become popcorn. Berlo took its popcorn to public places, warmed it over and sold it by the box full. The Supreme Court held that Berlo was not engaged in manufacturing and was therefore required to pay the Capital Stock Tax. *Commonwealth v. Berlo Vending Co.,* 415 Pa. 101, 202 A. 2d 94 (1964). The court felt that the transformation from kernel to popcorn was a superficial rather than a substantial transformation and that little skill was involved in bringing about the result.

The Tetley Tea Company by the use of intricate machinery separated tea from foreign matter, blended the tea and placed it in bags fabricated by it. Its mechanics received special training. The Supreme Court held this process not to be manufacturing because no new and different product was created. "The process starts and ends with tea." *Commonwealth v. Tetley Tea Company, Inc.,* 421 Pa. 614, 617, 220 A. 2d 832, 834 (1966).

In *General Foods Corp. v. Pittsburgh,* 383 Pa. 244, 118 A. 2d 572 (1955), the decaffeination of coffee and the canning of foods were held not to be manufacturing. In another case, the production of potato chips was held to be manufacturing apparently because of the considerable skill required in selecting and aging the potatoes. *Commonwealth v. Snyder's Bakery,* 348 Pa. 308, 35 A. 2d 260 (1944).

The Electric Welding Company purchased steel rods and coils. It cut the rods to various lengths and bent and twisted them to suit specific concrete reinforcing

purposes for which uses they were sold to contractors. The coils it straightened, recoiled, assembled into a spiral and stabilized by steel channels tack-welded to the spiral, for sale to the contracting trades as reinforcing elements in concrete columns and piers. The Supreme Court held that these operations did not result ". . . in any well signalized or substantial transformation in the form or quality of the steel materials . . ." bought from the producers and resold ". . . with a twist or bend to its customers" and therefore were not manufacturing. *Pittsburgh v. Electric Welding Co.*, 394 Pa. 60, 64, 145 A. 2d 528, 530 (1958).

Directing our attention to appellant's activities, we note that they consist of obtaining various type of scrap metal from which, as in the case of the tea company, it removes unwanted matter, but which as contrasted to the blending of tea, it separates according to grades. We note that as in the case of the seller of reinforcement steel, the appellant cuts its scrap into merchantable lengths and by pressure compacts it to a size and density desired by its customer, the steel manufacturer. Appellant by compacting the scrap causes it to occupy a much smaller space than it did previously, as contrasted to the capacity of the kernels of corn to occupy more space when the oil is right. But, as with the tea blender, the steel bar and coil preparer and the popcorn maker, the appellant's process starts and ends with scrap. Nothing of metallurgical significance occurs to any particular article of scrap. It is true that by placing individual pieces of scrap with others of like composition a bundle of scrap having properties useful in making a particular grade of steel results. But the bundle is still scrap metal, as the reinforcing rod is still a rod, the tea bag is still tea and the popcorn still corn.

Our conclusion that the appellant's capital is not employed in manufacturing, is supported in the only cases precisely in point. *Richman Sons, Inc. v. School District of Philadelphia*, 1 D. & C. 2d 670 (1954); *Commonwealth v. The Deitch Company*, 94 Dauphin 112 (1971). We are told that *Deitch* is on appeal to the Pennsylvania Supreme Court. *Commonwealth v. Sitkin's Junk Co., Inc.*, 412 Pa. 132, 194 A. 2d 199 (1963), holding that an operation identical to appellant's was manufacturing within the Selective Sales and Use Tax Act's definition of that word as the performance of operations placing personal property in a form, composition or character different from that in which it is acquired, is of no assistance here.

The Commonwealth additionally contends that there are no issues before us because the appellant rather than specifying its objections in its appeal here, referred by reference to its petition for review to the Board of Finance and Revenue. The Commonwealth cites Section 1104 of the Fiscal Code, Act of April 9, 1929, P. L. 343, 72 P.S. §1104, under which the appeal here was made as requiring a statement of objection in the appeal and contrasts it with Section 1103, 72 P.S. §1103, which allows incorporation by reference. While we do not condone the practice here employed, we have concluded that in this essentially one issue case there was sufficient compliance with the statute especially as the petition for review was attached as an exhibit to the appeal. The purpose of both sections is to provide the taxing authorities and the reviewing body with notice of the issues and this was accomplished here.

CONCLUSIONS OF LAW

1. Appellant is engaged in the business of buying, cleaning, sorting, cutting and compacting scrap metal for sale to and use by steel manufacturers.

2. The activities engaged in by the appellant are not manufacturing and its capital is not employed in manufacturing for purposes of the Capital Stock Tax.

3. The capital stock of the appellant corporation for its fiscal year ending September 30, 1969 is subject to the Capital Stock Tax in the sum of $3,558.00 as settled by the Revenue Department and sustained by the Resettlement Board and the Board of Finance and Revenue.

### ORDER

AND NOW, the appeal of Morrisville Scrap Processing Company, Inc. is denied, the decision of the Board of Finance and Revenue is affirmed and judgment is entered in favor of the Commonwealth of Pennsylvania in the sum of $3,558.80 with interest from August 17, 1970, the date of settlement.

---

DISSENTING OPINION BY JUDGE BLATT:

I respectfully dissent.

The record made by the appellant in this case, it seems to me, *does* contain such "technical and metallurgical testimony" and evidence of "chemical changes" to *some* of the scrap under the appellant's administrations as would warrant a result different from that reached by the majority here and by this and other courts in previous and somewhat similar cases.

I would subscribe to many of the findings of fact listed by the majority, but, as I have understood the evidence presented, findings Nos. 6, 7, 8 and 9 are open to some question, and I would prefer to see them replaced by different findings and supplemented by others which I shall list below. In the light of my different findings then, I would hold that a substantial part of the appellant's operations *do* constitute manufacturing within the precedents laid down by previous

decisions, and that its total liability for capital stock tax during the period in question should be adjusted accordingly.

First, as to the majority's findings of fact:

Finding No. 6 may be technically accurate in its holding that "nothing is added to the scrap by the appellant." It seems misleading to me, however, in that it minimizes the importance of the skill or technical training required for the operations engaged in by the appellant, and these are certainly "added." Moreover, pressure has likewise been "added" to some of the scrap, after the scrap has been sorted and the suitable scrap selected. This pressure, which has resulted in heat, suitably cooled by water, has forced a compaction of the scrap. Further, scrap which had no value previously is here given a value by the preparation afforded it so that it is now suitable for use in the making of steel. To say that nothing has been "added" to it is to engage in an exercise in semantics which beclouds the fact that the scrap *has* been substantially changed.

Finding No. 7 is inaccurate, I believe, because the appellant actually performs *two* general types of operations after separating and grading the metal scrap which is brought to it, and only one of these operations is described in this finding, namely, the compacting of scrap into bundles of a size and density suitable for use in the manufacture of steel. The other operation consists merely of cutting, and is used only for long pipes, beams, etc. where a reduction to a shorter and uniform length is all that is required.

Finding No. 8, while essentially correct as to what is done in one of the appellant's operations, minimizes both the effect of the heat generated in the process and the changes resulting in the scrap compacted. Actually, suitable pieces of scrap of many and varied

dimensions and shapes are compacted into uniformly sized bundles of prescribed density and compaction. They pass through a process in which heavy pressures are applied from all sides by trained operators, who simultaneously apply water as a cooling agent in the quantities necessary to keep the heat generated in the compacting process to such a degree that the density required in the compacting process is reached, no less and no more. While the majority may be technically correct in holding that no chemical change occurs in this process, the fact remains that the scrap, before the compacting, could not be used in the making of steel and that, after the compacting, it can be so used. Whatever the change, it has been a highly significant one, and it *has* been a change.

Finding No. 9, like No. 8, is also essentially correct, but, again, if the open spaces in the selected scrap are eliminated, and if it is made to become "more like solid pieces of steel," the total bundle of compacted scrap now has a greater density than the miscellaneous scrap had previously. It also has a new size and shape, equally as essential as its new density for the use for which it is now intended, a use for which it was not previously suitable, and a use, moreover, which is clearly a part of this steel-making process.

In place of the above findings, therefore, I would suggest the following:

Finding No. 6. Unprepared iron and steel scrap cannot be used by a steel mill or foundry because of improper chemistry, density, size and/or metallurgy.

Finding No. 7. The function performed by the appellant in the operations in its business is the first step in steel making. When this phase of steel making is performed by the steel mills themselves, the Commonwealth treats it as a manufacturing function. Prior to the advent of the scrap iron industry, these func-

tions were performed within the plants of the steel mills and foundries.

Finding No. 8. The steps of manufacturing unprepared scrap metals into specified finished grades suitable for remounting into new steel without further processing are similar to the process by which a blast furnace in a steel mill produces hot metal or pig iron suitable for remelting into new steel. This process is considered by the Commonwealth to be manufacturing.

Finding No. 9. The scrap iron processor such as appellant, in manufacturing and producing a useful end product, includes cutting and torching, hydraulic pressure, shredding, and other mechanical means of achieving this specific end product by art, skill, expert labor, and machinery. Unprepared scrap iron and steel lack sufficient density and identifiable metallurgical content to achieve remelting. If the material is light and fluffy, it burns up as iron oxide when placed in the furnace. If the material is excessively dense in molecular content, it is incapable of meeting the remelting requirements because of requiring excessive amounts of heat or furnace time. The utilization of heat, the combination of elements adding to or subtracting from the primary product in order to achieve the standards of a formula are precisely what is involved in the making of steel. Similarly the achievement of prepared grades of heavy melting iron and steel scrap involves the same steps in reverse and sometimes in parallel consequence. Where a steel mill extrudes or rolls out an ingot, slab, billet, bloom or bar, the appellant and companies of like characteristic reverse the extruding process in order to achieve the requirements of a melting furnace. These same acts when performed by the steel mills themselves are regarded by the Commonwealth as manufacturing.

Finding No. 10. The appellant's machinery, equipment and plant are designed to meet the requirements

of the first major step in the steel making process. Prior to the development of a modern scrap iron production yard, steel mills and foundries conducted these functions exclusively in their own plants. When this was performed within their own plants, the Commonwealth has never refused to interpret it as being manufacturing. Appellant performs this vital function within the steel making process. Appellant performs the first step in the manufacturing and processing of steel and as a correlating procedure in achieving an open hearth electric furnace or basic oxygen furnace charge equal to the result of a blast furnace in producing hot metal or pig iron from limestone, iron, ore, and coke.

Finding No. 11. The appellant's business activities produce a new and different product having a distinctive name, character and use different from the material from which the product was made. For example, an automobile having as its primary use the transportation of people and called a Ford or Chevrolet, is produced into what is now called a No. 2 bundle, having as its primary use the charging into an open hearth or electric furnace for remelting into new steel. Its dimensions of approximately 6 feet by 18 feet by 4½ feet, which are large enough to accommodate six people, have been reduced to a compact mass of approximately the size of a floor model television set.

Having made these findings, I would conclude that some of the activity presently carried on by the appellant is manufacturing within the terms of the Capital Stock Tax Act of June 1, 1889, P. L. 420, as amended, 72 P.S. §1871, and that the cases cited by the majority to the contrary may be distinguished.

There *was,* I believe, "a substantial transformation in form, quality and adaptability in use from the original, so that a new article or creation has emerged." *Commonwealth v. Weiland Packing Company,* 292 Pa.

447, 141 A. 148 (1928). *Commonwealth v. McCrady-Rodgers Company,* 316 Pa. 155, 174 A. 395 (1934).

Unlike the situation in *Commonwealth v. Berlo Vending Company,* 415 Pa. 101, 202 A. 2d 94 (1964), where corn and salt were poured into preheated oil so that the corn became popcorn, and where the Supreme Court held that the transformation was "superficial" rather than "substantial," here we have useless junk brought to the appellant's place of business and sorted, selected and compacted so as to become a useful commodity. Unfortunately, it is still commonly referred to as junk, but the nomenclature cannot obscure the fact that there *has* been a substantial change. It is certainly *not* what it was before.

In *Commonwealth v. Tetley Tea Company, Inc.,* 421 Pa. 614, 220 A. 2d 832 (1966), the Supreme Court held that the blending and bagging of tea was manufacturing and commented that "the process starts and ends with tea." The majority here implies that the process in this case "starts and ends with junk," but such is not really correct. The process may start with valueless junk, but it certainly ends with a product which is essential in the manufacture of steel, and which has a new value of its own, no matter what it is called.

It is only in *Pittsburgh v. Electric Welding Company,* 394 Pa. 60, 145 A. 2d 528 (1958), that the majority cites a case where a process clearly similar to that performed in *some* of the appellant's operations is involved, but, as noted above, I would agree that not all of the appellant's operations are manufacturing. Those which require only the cutting of heavy pipes and beams, as was true in the *Pittsburgh* case, so that merely the linear measurements are changed, are by no means the same as those requiring compacting.

As the majority indicates, of course, there appear to be two lower court cases, one of which is now on

appeal to the Supreme Court, where operations similar to those of the appellant were involved and where the lower courts concerned held these operations not to constitute manufacturing within the terms of the General Business Tax Act of May 23, 1949, P. L. 1669, as amended, 24 P.S. §585.1 et seq. *Richman Sons, Inc. v. School District of Philadelphia*, 1 D. & C. 2d 670 (1954), or within the terms of the Capital Stock Tax Act, *Commonwealth v. The Deitch Company*, 94 Dauph. 112 (1971). It is my opinion, however, that in neither of these cases was a record made by the protesting taxpayer so clear and precise in its evidence as to the operations of the taxpayer as was made in this case. Here the appellant has offered the testimony of competent witnesses, in considerable depth, which satisfies me at least that, as I have said, a substantial part of what it does *is* manufacturing.

In view of my belief that the findings of fact made by the majority are not completely correct and that their discussion of allegedly relevant cases is not exactly in point, I would conclude that:

(1) The appellant is engaged in the business of buying, cleaning, sorting, cutting and compacting scrap metal for sale to and use by steel manufacturers in the manufacture of steel.

(2) Insofar as the activities of the appellant relate only to the cutting of scrap metal, it is not engaged in manufacturing and its capital is not employed in manufacturing for purposes of determining liability for capital stock tax.

(3) Insofar as the activities engaged in by the appellant relate to classifying, sorting and *compacting* scrap metal, however, its activities are manufacturing and its capital is to that extent employed in manufacturing for purposes of determining liability for capital stock tax.

(4) The capital stock of the appellant corporation for its fiscal year ending September 30, 1969 is subject to capital stock tax in that proportion which the amount of its business described in paragraph 2 above (i.e., cutting *only*) bears to the total, and is not subject to capital stock tax in that proportion which the amount of its business described in paragraph 3 above (i.e., compacting) bears to the total, each part bearing its proportionate share of the joint costs of buying, sorting, storing, transporting and other overhead expenses.

I would order, therefore, that the appeal of the Morrisville Scrap Processing Company, Inc. be upheld in part and that the case be remanded to the Board of Finance and Revenue for a determination as to what part of the appellant's business is manufacturing in the light of this opinion and for a determination in that context of the proportion of the amount of capital stock tax due for the year in question.