Commonwealth of Pennsylvania *v.* Perfect Photo, Incorporated, Appellant.

Argued February 1, 1977, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*James A. Young,* with him *David H. Rosenbluth,* and *Stradley, Ronon, Stevens & Young* for appellant.

*Joseph F. Lynch,* Deputy Attorney General, with him *Donald J. Murphy,* Deputy Attorney General, for appellee.

OPINION BY JUDGE MENCER, April 7, 1977:

As we focus in upon the issue of this appeal, we discern a visible image of a photofinisher seeking a ruling that it is engaged in manufacturing and therefore exempt from capital stock taxation under Section 21 of the Capital Stock Tax Act of June 1, 1889, P.L. 420, *as amended* (Act).[1] Perfect Photo, Incorporated (taxpayer) contests a decision of the Board of Finance

---

[1] Sections 20 and 21 of the cited act, formerly found at 72 P.S. §§1871, 1891, 1892, 1901 and 1902, were repealed and replaced by Article VI of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, 72 P.S. §§7601-7606.

and Revenue which sustained a resettlement by the Department of Revenue of the taxpayer's capital stock tax for the fiscal year ended March 31, 1966.[2]

We make the following

## FINDINGS OF FACT

1. Taxpayer was incorporated in Pennsylvania for the purpose, *inter alia*, of photofinishing.

2. Taxpayer's income-producing activities fall into four general classifications: (1) developing of negative film and making photographic prints therefrom; (2) developing and processing reversal film into color transparencies, consisting of "slides" and "movie" film; (3) enlargement of negatives, slides and of photographs; and (4) retail and wholesale sale of photographic equipment (no manufacturing exemption is claimed for this activity).

3. All film processed by the taxpayer is received by mail or pickup delivery from customers after the film has been exposed.

4. Taxpayer maintained three facilities in Philadelphia and Pittsburgh in the fiscal year in question.

5. The 1966 sales of taxpayer total $31,000,000. Taxpayer handled an average of 365,000 color transparencies (slides) a week, produced 754,000 color prints per week, 143,000 black and white prints per week, and processed 12,960 rolls (50 feet each) of moving pictures films.

6. The development process involves the use of many pieces of equipment. The process of developing exposed film results in the production of an image, a silver negative image in the case of black and white film and a color dye image in the case of color film. The silver negative images are called negatives and

---

[2] A jury trial has been waived by the parties, in accordance with the provisions of Section 1 of the Act of April 22, 1874, P.L. 109, *as amended*, 12 P.S. §688.

positive color dye images are called color transparencies, while negative color dye images are called negatives.

7. The following stages or steps are involved in the development and processing of reversal film into color transparencies: (a) separation of film from container; (b) assembly of exposed but undeveloped film of various customers in 1000-foot reels; (c) loading of reels on developing equipment; (d) preparation and testing of color developers in large containers or vats (the color developers are mixed under laboratory control and are classified as magenta developer, cyan developer, and yellow developer); (e) transmission by conveyor belt of film through dark room for development which involves the activation of silver halide grains, emergence of color dye image and removal of excess silver halide—the exposure to the three prime colors above, plus chemical action, produces all colors of the spectrum; (f) inspection of transparencies for quality results; (g) cutting of individual transparency; (h) insertion of transparency in frame and gluing of product in place to produce slides; and (i) identification and boxing of transparencies.

8. All of these procedures described in finding of fact 7, except (h), are involved in the development of color movies and in lieu of (h) the developing of the movie film involves the splicing of the film at the proper place and the mounting of the film on 50-foot reels.

9. The developing of color negative film involves steps similar to those outlined for developing of color transparency film, except steps (g), (h), and (i), and in lieu thereof printers use a special type of printing equipment to produce the final photograph. This equipment produces prints at the rate of 2,000 to 3,000 per hour, and the operator is required to view each negative and determine the necessary density classifi-

cation and feed this information into the equipment by depressing the correct button.

10. Taxpayer makes reproductions, called prints and enlargements, from both the negatives and the transparencies. The prints and enlargements are made on paper purchased by taxpayer. All the chemical ingredients which are used to make the negatives, transparencies, color movies, prints and enlargements, as well as the paper on which the prints and enlargements are made, are purchased by taxpayer.

11. Prints and enlargements are made from the black and white negatives and the color negatives, described above, by exposing sensitized paper to a light source projected through the negative. The sensitized paper is then processed, in the manner similar to that in processing the exposed film, with the end result that positive black and white and color images are produced on that paper, *i.e.*, the photograph.

12. Film is constructed of an acetate base, coated with an emulsion layer or layers which contain light-sensitive chemical. The chemical construction of the emulsion layer in negative film is usually referred to as print film, whereas reversal film is usually referred to as slide film. Prints, either color or black and white, are the end products of proper utilization of the negative film; slides or movie film are the end products of proper utilization of reversal film. "Movies" are a roll of uncut slides moving rapidly before the lens of a projector for viewing purposes, as opposed to the one-at-a-time projection of slides.

13. Taxpayer's capital stock for the fiscal year ended March 31, 1966 had a value of $5,500,000.

## DISCUSSION

The Commonwealth assessed the capital stock tax against the taxpayer for its fiscal year ending March

31, 1966, although Section 21(a) of the Act, *as amended* by the Act of August 13, 1963, P.L. 799, §1, provided that it should "not apply to the taxation of the capital stock of corporations . . . which is invested in and actually and exclusively employed in carrying on manufacturing . . . within the State. . . ." The element of difficulty in this and other cases dealing with the capital stock tax manufacturing exemption arises from the absence of any statutory definition of the term "manufacturing." *Commonwealth v. Deitch Co.*, 449 Pa. 88, 295 A.2d 834 (1972). The word "manufacturing" when employed in a statute, or taxing measure, without further definition, consists in the application of labor and skill to material whereby the original article is changed into a new, different, and useful article. *Morrisville Scrap Processing Co., Inc. Tax Appeal,* 6 Pa. Commonwealth Ct. 121 (1972), *aff'd,* 453 Pa. 610, 307 A.2d 905 (1973). Whether or not an article is a manufactured product depends on whether it has gone through a substantial transformation in form, qualities, and adaptability in use from the original so that a new article or creation has emerged. *General Foods Corp. v. Pittsburgh,* 383 Pa. 244, 118 A.2d 572 (1955). If there is merely a superficial change in the original materials without any substantial and well-signalized transformation in form, qualities, and adaptability in use, it is not a new article or new production. *Commonwealth v. Berlo Vending Co.,* 415 Pa. 101, 202 A.2d 94 (1964).

Our study of the many cases dealing with an analysis of various business activities to determine whether they constitute manufacturing convinces us of the aptness of the observation by Mr. Chief Justice Eagen in *Commonwealth v. Deitch Co., supra*: "Concededly, 'it is sometimes difficult to determine with legal exactness what is and what is not manufacturing', for as one court has observed, '[i]t is easier to feel

the line of distinction than to express it. . . .' '' 449
Pa. at 94, 295 A.2d at 837-38. (Citations omitted.)

Here the taxpayer is engaged in the making of prints, slides, and moving picture films. An essential step in obtaining these final results is the production of a negative which in turn involves a series of chemical reactions in the coating of the film, the first of which is caused by the in-camera exposure of the film to light. The exposed film is the beginning item and the prints, slides, and films are the new items, with the negative being the necessary intermediate item. A profound change occurs in the composition and character of the item, exposed film, by the time it finally is returned to the consumer as a print, slide, or moving picture film. *Compare Commonwealth v. Olan Mills, Inc. of Ohio*, 456 Pa. 78, 317 A.2d 592 (1974).

Our examination of the record discloses that this case is distinguishable from *Commonwealth v. Trinity Court Studios*, 39 Dauph. 244 (1934). In *Trinity*, it was held that one engaged in the production of photographic portraits by exposing individual photographic plates, developing each plate and retouching the plate, and producing a photographic print was not a manufacturer. The *Trinity* court, relying on the rule that it is the popular understanding of what is manufacturing that prevails, concluded that the making of a photograph is not manufacturing in the popular sense of the word. We conclude that the making of prints, slides, and moving picture films has drastically changed since 1934, and the present-day methods and procedures utilized by the taxpayer here do bring the making of these items within the popular sense of the word "manufacturing." *See Pillsbury Mills, Inc. v. Pittsburgh School District*, 408 Pa. 369, 184 A.2d 236 (1962) (milling of flour from many types of wheat

held manufacturing), where it was recognized that "[p]resent day milling bears no relationship to the mortar and pestle operation of ancient times."

We cannot conclude other than that a new, different, and useful articles has emerged here from the application of labor and skill, whereby the original exposed film is converted or changed to manufactured products; namely, prints, slides, and movie films.[3] An item is a manufactured article when the end product is a new and different article with a distinctive name, character, and use.[4]

The question, what is manufacturing? can only be answered as it was long ago in *Norris Brothers v. The Commonwealth*, 27 Pa. 494, 496 (1856) : It is making. It consists in giving new shapes, new qualities, or new combinations to matter which has already gone through

---

[3] Although the test of what is manufacturing varies in those cases where a statutory definition is applicable, the concept of a new and different article evolving at the final stage of the taxpayer's operations is essential to the conclusion that one has been engaged in manufacturing. Therefore, we can separate this taxpayer's activities by which exposed film with invisible images is converted to prints, slides, and movie films from the activities of those taxpayers who commenced with junk and ended with junk, *Commonwealth v. Deitch Co., supra;* commenced with tea and ended with tea, *Commonwealth v. Tetley Ta Co., Inc.,* 421 Pa. 614, 220 A.2d 832 (1966) ; commenced with corn kernels and ended with popped corn, *Commonwealth v. Berlo Vending Co., supra;* commenced with coffee and ended with coffee, *Commonwealth v. Lowry-Rodgers Co.,* 279 Pa. 361, 123 A. 855 (1924) ; commenced with scrap and ended with scrap, *Morrisville Scrap Processing Co., Inc. Tax Appeal, supra;* or commenced with lumber and ended with lumber, *Commonwealth v. Babcock Lumber Co.,* 1 Pa. Commonwealth Ct. 45, 272 A.2d 522 (1971).

[4] Compare *Commonwealth v. Berlo Vending Co., supra,* where the production of popcorn was held not to be manufacturing because (1) it did not require any specific skill or elaborate machinery, (2) a child could make it at home, and (3) the change in form and size of the corn kernel was merely superficial.

some other artificial process.[5]  The activties of the taxpayer surely change useless exposed film, with its invisible images, into new items having retainable and useful form with visible images. We view this record to establish that the taxpayer is within the exemption provision and should not, therefore, be subjected to the tax.[6]

## Conclusions of Law

1. Perfect Photo, Incorporated, is engaged in the business of photofinishing, whereby exposed film is changed to negatives and finally to prints, slides, and moving picture films for use by the general public.

2. The activities engaged in by Perfect Photo, Incorporated, in the business of photofinishing constitute manufacturing, and its capital so employed is used in manufacturing for purposes of capital stock tax liability under the Act of June 1, 1889, P.L. 420, *as amended*.

---

[5] *See Atlantic Refining Co. Case*, 398 Pa. 30, 156 A.2d 855 (1959) (refining of oil from crude held to be manufacturing) ; *Commonwealth v. Snyder's Bakery*, 348 Pa. 308, 35 A.2d 260 (1944) (making of potato chips from potatoes held to be manufacturing) ; *Commonwealth v. Peerless Paper Specialty, Inc.*, 344 Pa. 283, 25 A.2d 323 (1942) (making of sealing tape from paper and glue held to be manufacturing) ; *Commonwealth v. McCrady-Rodgers Co.*, 316 Pa. 155, 174 A. 395 (1934) (making concrete from mixing cement, sand, gravel, course aggregate, and water held to be manufacturing).

[6] The Commonwealth argues that the taxpayer does not qualify for the manufacturing exemption because it was not organized for the purpose of manufacturing and cites in support thereof the cases of *Commonwealth v. Jeca Corp.*, 81 Dauph. 36 (1963), and *Commonwealth v. Trinity Court Studios, supra*. The taxpayer's corporate charter lists "photo finishing" among the purposes for which it organized. Although the charter does not specifically mention "manufacturing", the charter purpose of "photo finishing" encompasses activities which we have concluded to be, in fact, manufacturing. Therefore, the taxpayer satisfies the organizational purpose that qualifies it for the manufacturing exemption sought here. *Commonwealth v. Paul W. Bounds Co.*, 316 Pa. 29, 173 A. 633 (1934).

3. The capital stock of Perfect Photo, Incorporated, for its fiscal year ended March 31, 1966, is not subject to the capital stock tax in the sum of $22,032.69, as settled by the Revenue Department and sustained by the Resettlement Board and the Board of Finance and Revenue.

4. Perfect Photo, Incorporated, is subject to capital stock tax liability for its income-producing activities for which it does not claim the manufacturing exemption.

5. Judgment should be entered in favor of the Commonwealth and against Perfect Photo, Incorporated, in the amount of $570.73, that being the amount of the capital stock tax for the fiscal year ended March 31, 1966 reported by Perfect Photo, Incorporated.

Accordingly, we enter the following

## ORDER

Now, this 7th day of April, 1977, the appeal of Perfect Photo, Incorporated, is hereby sustained, and judgment is directed to be entered in favor of the Commonwealth and against Perfect Photo, Incorporated, in the amount of $570.73, together with interest and costs according to law, and said judgment to be satisfied of record upon proof of payment, unless exceptions be filed hereto within thirty (30) days.

## AMENDED ORDER

Now, this 10th day of May, 1977, upon stipulation of counsel for the Commonwealth and the taxpayer in the above matter, the Court's order of April 7, 1977, entered in the above captioned matter is amended to reflect that the judgment entered in favor of the Commonwealth and against Perfect Photo, Incorporated, is in the amount of $1,176.83, together with interest and costs according to law, rather than $570.73 as in-

dicated in this Court's previous order. The order of April 7, 1977 is in all other respects unaffected hereby and the appropriate time period within which either party might execute an appeal from the order of this Court in the above captioned matter shall be governed by the date of April 7, 1977, the date on which the original order of judgment was entered. The amended judgment shall be satisfied of record upon proof of payment.