## Golden Triangle Broadcasting v. Pittsburgh

*Frank L. Seamans* and *Dale Williams,* for plaintiffs.

*Grace Harris,* for defendants.

WEKSELMAN, *J.,* April 19, 1976—Plaintiffs filed an action in equity against defendants seeking a declaration that the imposition by the City of Pittsburgh of its business privilege tax upon plaintiffs constitutes an abridgement of the rights of plaintiffs and the public to free speech and free press guaranteed by the United States and the Pennsylvania Constitutions; a declaration that the imposition of the tax upon plaintiffs constitutes an abridgement of plaintiffs' rights to equal protection of law and due process of law as guaranteed by the United States and the Pennsylvania Constitutions; a declaration that the receipts from broadcasting of plaintiffs are related to the business of manufacturing and, therefore, not subject to the business privilege tax; a preliminary and permanent injunction restraining and enjoining

defendants from levying, imposing, assessing or collecting the business privilege tax from plaintiffs; and such other relief as the court might deem meet.

Defendants filed their answer and, subsequently, the parties jointly moved for a continuance of the matter pending disposition of Pittsburgh Press Company v. The City of Pittsburgh, then pending in this court at October term, 1970, no. 864. That case was determined here, and finally by the Commonwealth Court of Pennsylvania in City of Pittsburgh v. Pittsburgh Press Company, 14 Pa. Commonwealth Ct. 551, 322 A.2d 390 (1974). Upon the determination of the Pittsburgh Press case, the instant litigation was reactivated and was tried by the chancellor.

At trial, the parties entered into a stipulation whereby plaintiffs presented evidence limited to the operations of Westinghouse Broadcasting Company (KDKA). The stipulation provided that each of plaintiffs' cases would be determined upon the basis of the evidence presented at trial on behalf of KDKA as to the operation of its television and radio broadcasting activities.

The business privilege tax in question was enacted by the City of Pittsburgh in accordance with the Local Tax Enabling Act of December 31, 1965, P.L. 1257, sec. 1, et seq., as amended, 53 P.S. §6901, et seq. That act contains a grant of taxing power to municipalities and purportedly authorizes the city to levy and collect the tax here in question. Plaintiffs contend that since the local Tax Enabling Act withholds the power from the city to impose a business privilege tax on the business of manufacturing, the tax may not be imposed upon their gross receipts. They further con-

tend that the imposition of the tax upon them would constitute a violation of the constitutional guarantees of equal protection under Section 1 of the Fourteenth Amendment to the Constitution of the United States and of the uniformity of taxation provision of article VIII, sec. 1, of the Constitution of Pennsylvania, inasmuch as at least certain elements of the press have been found to be engaged in manufacturing and, therefore, not required to pay the business privilege tax. Finally, plaintiffs argue that the imposition of the tax on them would constitute a violation of article I, sec. 7, of the Pennsylvania Constitution and the First and Fourteenth Amendments of the United States Constitution as an unlawful tax on freedom of speech and freedom of the press. Since the chancellor concludes that plaintiffs are engaged in manufacturing and that their gross receipts are not subject to the tax, it will not be necessary to reach or decide the constitutional questions raised by plaintiffs.

The Local Tax Enabling Act, insofar as it is here pertinent, provides:

"The duly constituted authorities of . . . cities of the second class, . . . may, in their discretion, by ordinance or resolution, for general revenue purposes, levy, assess and collect or provide for the levying, assessment and collection of such taxes as they shall determine on persons, transactions, occupations, privileges, subjects and personal property within the limits of such political subdivisions. . . . Such local authorities *shall not have authority* by virtue of this act:

". . .

"(4) *To levy, assess and collect a tax on goods and articles manufactured in such political sub-*

*division or on the by-products of manufacture,* or on minerals, timber, natural resources and farm products produced in such political subdivision or on the preparation or processing thereof for use or market, *or on any privilege, act or transaction related to the business of manufacturing,* the production, preparation or processing of minerals, timber and natural resources, or farm products, *by manufacturers,* by producers and by farmers *with respect to the goods, articles and products of their own manufacture,* production or growth, or on any privilege, act or transaction relating to the business of processing by-products of manufacture, or on the transportation, loading, unloading or dumping or storage of such goods, articles, products or by-products; except that local authorities may levy, assess and collect taxes on the occupation, occupational privilege, per capita and earned income or net profits of natural persons engaged in the above activities whether doing business as individual proprietorship or as members of partnerships or other associations.": 53 P.S. §6902. (Emphasis supplied.)

As stated by the Commonwealth Court in City of Pittsburgh v. Pittsburgh Press Company, supra:

" 'The words "shall not have authority" such as are set forth in the Enabling Act have been construed to be a limitation on the power of a municipality to tax; therefore, any doubt relating to their construction will be resolved in favor of the plaintiff . . . Directory Publishing Co., Inc. v. Pittsburgh, 205 Pa. Superior Court 423 [211 A.2d 509] (1965).' "

The record in the instant case, as it did in City of Pittsburgh v. Pittsburgh Press, leads to the ines-

capable conclusion that broadcasting and telecasting constitute manufacturing.

The courts of this Commonwealth and other jurisdictions have defined manufacturing in many contexts. In Norris Brothers v. Commonwealth, 27 Pa. 494 (1856), our Supreme Court said the following:

"But what is manufacturing? It is making. To *make* in the mechanical sense does not signify to create out of nothing; for that surpasses all human power. It does not often mean the production of a new article out of materials entirely raw. It generally consists in giving new shapes, *new qualities,* or *new combinations* to matter which has already gone through some other artificial process." (Emphasis supplied.)

In Commonwealth v. Deitch Co., 449 Pa. 88, 93, 295 A.2d 834 (1972), the Supreme Court said:

"Whether or not an article is a manufactured product depends upon whether or not it has gone through a substantial transformation in form, qualities and adaptability in use from the original material, so that a new article or creation has emerged (Citing a case)."

In Commonwealth v. Olan Mills, Inc., 456 Pa. 78, 317 A.2d 592 (1974), it was held that photography constitutes manufacturing. Reeve Music Co. v. Crest Records, Inc., 285 F.2d 546 (2d Cir., 1960), held that the transformation of electrical waves into grooves of a phonograph record is a manufacturing process. Electrical power companies have been held to be manufacturing corporations by virtue of their conversion of raw materials such as coal, oil or natural gas, in conjunction with labor, skill and machinery, into electricity: Southern Electric Light and Power Company v.

City of Philadelphia, 191 Pa. 170, 43 Atl. 123 (1899); Commonwealth v. Keystone Electric Light, 193 Pa. 245, 44 Atl. 326 (1899). Plaintiffs have presented briefs citing numerous cases from this and other jurisdictions defining manufacturing and the chancellor's review of this record, in the light of those cases, compels a finding that these plaintiffs are engaged in manufacturing.

In Pittsburgh v. WIIC-TV Corp., 14 Pa. Commonwealth Ct. 18, 321 A.2d 387 (1974), a case involving the attempted imposition of a real estate tax on a television antenna tower, the pertinent enabling legislation provided that the tax could not be imposed upon " '. . . machinery, tools, appliances and other equipment contained in any mill, mine, manufactory, or industrial establishment . . .' " The Commonwealth Court there held that the antenna was part of an industrial establishment and, therefore, not subject to the tax. Most significantly in that case, at page 22, the Commonwealth Court stated: ". . . [I]t would seem that the same ordinary man would think of a TV station as an industrial establishment, especially if one were to tell him that a newspaper plant is such . . ."

Defendants seek to draw distinctions between the processes involved in the telecasting and broadcasting activities of plaintiffs and the processes involved in the printing of a newspaper. The arguments of the city with respect to the advertising revenues of a newspaper were not accepted in Pittsburgh Press, and they are no more persuasive here. In Pittsburgh Press, the city contended that the advertising matter underwent no change in the printing process; that, in essence, the Press began with an ad and ended with an ad.

The city further argued in Pittsburgh Press that the advertisers bought only space in the newspaper and that space is not a manufactured product. Here, the city argues that what goes into the microphone comes out of the radio receiver, and that what is observed by the cameras is what is observed on the television receiver. Further, the city contends that, unlike the newspaper situation, no tangible product is produced by plaintiffs. The chancellor rejects this simplistic view of the process involved in airing radio and television broadcasts.

The extensive record in this case provides ample support for the proposition that plaintiffs are engaged in manufacturing as that term has been construed by courts. In the broadcast of a TV program, optical information is changed into an electrical signal which is modified in many ways by the application of extremely complex technology. That electrical signal is eventually encoded and placed on the broadcaster's carrier and sent out to be received by a receiving set, decoded and put into such a state as to be viewed by the ultimate consumer. That which occurs in the television studio before the cameras may be viewed only by those who are in actual visual contact within the television studio, and nothing is available for the benefit of the consuming public until the highly technical process of transforming optical information into an electrical signal and back has been completed by the application of skill and labor, which results in a new, different and useful product. The same thing may be said of the radio broadcasting activities of plaintiffs. There, accoustical energy is changed to an electrical signal and made into a useful product. A broadcaster

could stand in a public place and shout and what he was saying would be available only to those within the range of his voice. By transforming that accoustical energy into an electrical signal and once again beaming it through the broadcaster's carrier to receiving stations, an entirely new and useful product is created by the application of labor and skill.

Nor does the chancellor believe that the fact that no tangible product is produced is controlling. Of course, one may purchase a newspaper, fold it up and carry it home under his arm, read the newspaper and utilize it subsequently for other purposes. One may wrap his garbage in the newspaper or put it on the bottom of his birdcage. One might even use it to provide the stimulus for the cheery fire in his fireplace. No such uses, of course, can be made of television or radio broadcasts which, when once viewed or heard, are apparently, for all practical intents and purposes, lost. That, however, does not change the fact that before the broadcast could be viewed or heard, the manufacturing process was, of necessity, completed. Further, the broadcast is no less "consumed" than is a newspaper after the consumer has completed his use of it.

Defendants' reliance on Commonwealth ex rel. Luckett v. WLEX-TV, Inc., 438 S.W. 2d 520 (1968), is misplaced. In that case, the Kentucky Court of Appeals held that certain machinery used by a television station was not involved in a manufacturing process for purposes of use taxes. The Kentucky definition of manufacturing, however, differs from the Pennsylvania definition, as indicated in the hereinabove cited cases. Kentucky has not defined manufacturing in terms of combining raw materials into something new through the use

of labor, skill and machinery. Instead, it has adopted the "common understanding of mankind" definition. The difference is clear when one considers that the Kentucky court in WLEX observed that a newspaper was not engaged in a manufacturing process. Moreover, the court observed that a television tower was subject to property taxes. Both of these observations are clearly contrary to Pennsylvania holdings in similar cases. WLEX, therefore, provides no support for the city's assertion that broadcasting should not be considered a manufacturing activity under the enabling act.

In Pittsburgh Press, supra, at page 557, the following appears:

" 'If the Court were to sustain the City's position, then neither the printing and circulation of advertising nor the printing and circulation of non-advertising newspaper content would be manufacturing. It could be said that straight editorial "copy" begins as editorial matter and ends as editorial matter in the finished newspaper; that sports and features begin as sports and features and end as such. In the final analysis, it is the printing process itself, i.e., the combining of raw materials, ink and paper, into something new (the newspaper) through the use of labor, skill and machinery which basically makes printing manufacturing.' "

While the court was there making a distinction between advertising revenues and circulation revenues, the city having conceded that circulation revenues were not taxable, the rationale with respect to the news, editorials, sports and features is directly analogous to the case at bar. One would not have to have a Ph.D. in English to paraphrase the above-quoted language of Pittsburgh Press to

reach the identical result with respect to broadcasting. When a book is published, the thought of the author which originated in his or her mind is eventually reproduced in the exact form, at least as to content in which it left the mind of the author. It has, of course, been transformed into a useable product by having been reduced to print and published in book form. Nevertheless, that which left the author's mind has eventually entered the mind of the reader. The same thing occurs with respect to radio and television broadcasting. No one would contend that the printing and publication of books is not a manufacturing process and one should not contend that broadcasting which takes the original visual or audio material and transforms it into a form which may be received well beyond the range of sight or hearing of the original, is not equally a manufacturing process.

What has been here said concerning the manufacturing character of the operations of plaintiffs is true whether the material is produced originally in the broadcasting studio or comes to it by network feed. Plaintiffs' operations are multiple in form. Certain shows are locally produced using live talent employed by the local broadcasters. News shows, for example, are locally produced and utilize the talents of locally employed personnel. Certain advertising material is produced by the broadcasters while other material is furnished by the advertisers. Certain shows are produced in network studios and the shows are then sent by telephone line to the local broadcasters. In each case, however, a manufacturing process occurs. Network feeds must be picked up when transmitted, monitored, taped and prepared for rebroadcast

at the particular time that they are to be carried on the air. Each such network feed goes through the process of transformation which occurs when live programing occurs. No matter which form of news or entertainment or feature or sports is being broadcast, the chancellor is convinced that a manufacturing process occurs. One need only read the testimony of the witnesses to establish the highly technical nature of the transformation which must occur between the origination of the material and its consumption by the viewing or listening consumer even if his technical education is insufficient to establish a full understanding of the scientific nuances of the process.

Finally, the chancellor concludes that the fact that the broadcasters, in essence, give their product without charge to the consuming public should not change the result. Broadcasters derive their revenues from those who seek to convey commercial messages to the consuming public. Were a newspaper to print its product and give it away to the public and derive all of its revenues from advertising, it would be no less a manufacturer than one who prints and sells the newspaper for a price. The same thing is true of broadcasters and the fact that they charge no fee to the listener or viewer and derive their revenues entirely from advertisers is not controlling.

A decree in conformity with the aforestated views will be entered.

## DECREE NISI

And now, April 19, 1976, it is ordered, adjudged and decreed as follows:

1. Since the gross receipts from broadcasting of plaintiffs are related to the business of manufacturing and are not, therefore, subject to the busi-

ness privilege tax, defendants are permanently enjoined from levying, imposing, assessing or collecting, and from attempting to levy, impose, assess or collect the business privilege tax upon or from the plaintiffs or any of them with respect to their respective broadcasting businesses and activities and/or the gross receipts therefrom.

2. The prothonotary shall notify all parties or their attorneys of the date of filing of this decree nisi and, if no exceptions are filed within 20 days of this notification, shall enter this decree nisi as a final decree.