City of Pittsburgh, Peter F. Flaherty, Mayor, and Joseph L. Cosetti, Treasurer, Appellants, *v.* Pittsburgh Press Company, Appellee.

Argued May 7, 1974, before President Judge Bow-
MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MENCER, ROGERS and BLATT.

*Grace S. Harris*, Special Assistant City Solicitor,
with her *Ralph Lynch, Jr.*, City Solicitor, for appel-
lants.

*Clyde A. Armstrong*, with him *William W. Scott,
Jr.*, *Frank Mast* and *Thorp, Reed & Armstrong*, for ap-
pellee.

OPINION PER CURIAM, July 18, 1974:

We affirm the final order of the court below upon
the comprehensive and scholarly adjudication of Judge
LORAN L. LEWIS, those portions of which we deem it
necessary here to reproduce, follow:

"The plaintiff, the Pittsburgh Press Company, brings
this suit in equity praying that this Court restrain and
enjoin the defendant, the City of Pittsburgh, and its

Chief Executive and Financial Officers from levying, imposing, assessing and collecting the Business Privilege Tax from the plaintiff based on its gross receipts from advertising.

. . .

"Pursuant to the Local Tax Enabling Act, the City of Pittsburgh in 1968 enacted the Business Privilege Tax Ordinance No. 675 which imposes a six mill tax on gross receipts for the privilege of engaging in business within the City and which limits the scope of the tax to persons or businesses which are within the taxing powers of the City of Pittsburgh.

"Plaintiff contends that its gross receipts from advertising are not subject to the taxing powers granted to the defendants by the Local Tax Enabling Act in that the printing and circulating of advertisements in the Pittsburgh Press constitute manufacturing at least to the same degree as, and in many respects to a greater degree than, the printing and circulating of the news content which is admittedly manufacturing; that if the printing and circulating of advertising does not constitute manufacturing, then the receipt of advertising revenues constitutes a 'privilege, act or transaction related to the business of manufacturing"; and that the imposition of said tax upon plaintiff constitutes an infringement upon and a suppression of the plaintiff's and the public's guaranteed right of free speech and press.

"The dispositive issue is whether or not plaintiff's gross receipts from advertising are subject to tax or, more specifically, whether or not advertisements appearing in a general newspaper are manufactured. The law of Pennsylvania has held, and the defendants admit, that the printing and circulation of news, including editorial, sports and features in a newspaper, constitute manufacturing; therefore, circulation receipts are tax exempt.

. . .

"The City of Pittsburgh ('City'), pursuant to authority granted to it by the Local Tax Enabling Act, Act of December 31, 1965, P. L. 1257, §1 et seq. (53 P.S. §6901 et seq.), ('Enabling Act'), enacted Ordinance Number 675, approved December 27, 1968, entitled 'Business Privilege Tax Ordinance' ('Ordinance'), which imposes an annual tax upon the privilege of conducting business in the City.

"The Enabling Act, in part, provides: '. . . The duly constituted authorities of . . . cities of the second class . . . may, in their discretion, by ordinance or resolution, for general revenue purposes, levy, assess and collect or provide for the levying, assessment and collection of such taxes as they shall determine on persons, transactions, occupations, privileges, subjects and personal property within the limits of such political subdivision(s). . . . Such local authorities *shall not have authority* by virtue of this act:

\* \* \* \*

" '(4) To levy, assess and collect a tax on goods and articles manufactured in such political subdivision or on the by-products of manufacture . . . or on any privilege, act or transaction related to the business of manufacturing. . . .' " (Emphasis supplied.)

"The words 'shall not have authority' such as are set forth in the Enabling Act have been construed to be a limitation on the power of a municipality to tax; therefore, any doubt relating to their construction will be resolved in favor of the plaintiff, Pittsburgh Press Company ('Press'). Directory Publishing Co., Inc. v. Pittsburgh, 205 Pa. Superior Court 423 [211 A. 2d 509] (1965).

"The law of this Commonwealth has held, and the City admits, that the printing and circulating of a newspaper constitutes manufacturing. Commonwealth v. J. B. Lippincott Co., 156 Pa. 513 [27 A. 10] (1893); Commonwealth v. Mann, 150 Pa. 64 [24 A. 601] (1892).

Accordingly, the City does not tax the Press's receipts from circulation.

"The defendant seems to indicate that the plaintiff newspaper is engaged in two separate lines of endeavor; viz, the printing of news and editorials, which the defendant admits is manufacturing, and the selling of advertising. However, it will be shown that the plaintiff does much more than merely sell ads, it manufactures ads which become an integral part of a newspaper and go through the same process as the printing of news and editorials.

"Is the printing and circulation of advertisements in a general newspaper manufacturing? The City contends that it is not, arguing first, that the ad undergoes no real physical transformation from the time it is submitted to the Composing Room until it is printed in the newspaper or, in other words, no new and different product is produced. Second, the City contends that an advertiser buys only space from a newspaper and that gross receipts from the sale of space are not gross receipts from the sale of a manufactured product. Finally, defendants urge that a newspaper can be manufactured by one not engaged in the sale of advertising.

"As authority for its position, the City relies in part upon Commonwealth v. Sunbeam Water Company, 284 Pa. 180 [130 A. 405] (1925); Commonwealth v. Tetley Tea Company, 421 Pa. 614 [220 A. 2d 832] (1966); and Commonwealth v. Weiland Packing Company, 292 Pa. 447 [141 A. 148] (1928). In Commonwealth v. Weiland Packing Company, supra . . . the Court stated: 'The elemental meaning of the term "to manufacture" is "to make" . . . to make and produce something as a new construction out of existing materials,' and 'If, however, there is merely a superficial change in the original materials or substances and no substantial and well signalized transformation in form, qualities and adaptability in use, quite different from the originals,

it cannot properly and with reason be held that a new article or object has emerged,—a new production been created.' The Court concluded that cutting and processing pork products was not manufacturing.

"In Commonwealth v. Tetley Tea Company, supra, p. 616, it was stated: 'We have defined "manufacturing" to be the application of skill and labor to materials so that there results a new, different and useful product. Philadelphia School District v. Parent Metal Products, Inc., 402 Pa. 361 [167 A. 2d 257] (1961).' The Court held that the cleaning, blending and processing of tea was not manufacturing, since you start with tea and end with tea.

"The Court in Commonwealth v. Sunbeam Water Company, 284 Pa. 180, 181 [130 A. 405, 406] (1925), quoted Commonwealth v. J. Frank Boyer Plumbing & Heating Company, 23 Dauphin Co. R. 296, 297 as follows: 'The words of the statute [manufacture] are indeed so familiar in use and meaning that they are confused by attempts at definition. Their first sense as used is fabrication or composition,—a new article is produced of which the imported material constitutes an ingredient or part. When we go further than this in explanation we are involved in refinements and in impracticable niceties.' That Court held that subjecting ordinary water to heat, converting it into steam and recondensing it into water did not constitute manufacturing.

"In the instant case, an advertising layout is composed of typewritten copy, photos, drawings or a combination of these, depending on the kind of ad involved. This layout is fed into the Press's production department and is used as a blueprint. After numerous procedures are performed, a press plate is finally molded which is mounted on the printing presses. The resulting finished product is an ad appearing in the completed newspaper, a totally new item in composition as

compared with the initial layout. Therefore, the Press does not begin with an ad and end with an ad. It begins with a blueprint or design of an ad and ends with a manufactured product, composed of ink and paper.

"If the Court were to sustain the City's position, then neither the printing and circulation of advertising nor the printing and circulation of non-advertising newspaper content would be manufacturing. It could be said that straight editorial 'copy' begins as editorial matter and ends as editorial matter in the finished newspaper; that sports and features begin as sports and features and end as such. In the final analysis, it is the printing process itself, i.e., the combining of raw materials, ink and paper, into something new (the newspaper) through the use of labor, skill and machinery which basically makes printing manufacturing. The same raw materials (and in some instances additional ones), the same labor and skill (and in some instances a higher degree of labor and skill), and the same machinery (and in some cases more complex machinery) are used to print advertising as are used to print the other material appearing in plaintiff's newspaper. Since the kind of printing process which results in a finished newspaper, so far as news, editorial, sport and feature content is concerned, constitutes manufacturing, the conclusion is inescapable that the printing and circulation of advertising content by the Press is manufacturing as well.

. . .

"Defendants argue further that an advertiser buys only 'space' in plaintiff's newspaper and that 'space' is is not a manufactured product. The City then concludes that gross receipts from the sales of advertising are not gross receipts from the sale of a manufactured product, the Press's only manufactured product being newspapers which are sold to the public. What does an advertiser buy from the Press? Obviously it pays

to have its ad printed in a certain number of newspapers. Merely because the advertiser does not take back its purchase in kind does not make the ad any less a manufacured product, or the monies received from the advertising customers any less receipts from the sale of a manufactured product.

"Suppose that the Press were solely a job printer. It would in that case print the customer's advertisement, for example, in the form of a handbill and return it to him for distribution. Under these circumstances, the Press would clearly be a manufacturer and the gross receipts received would certainly be gross receipts from the sales of manufactured products. Going one step further, the Press could print the handbill and also provide the means for its distribution. There can be no doubt that this would be the sale of a manufactured product. In the case at bar, as in the latter example, the Press prints the advertising matter and circulates it as well, the only difference being that the advertising matter is incorporated into the total newspaper and circulated as a single unit, together with news, editorials, sports and features. The Press's gross receipts from advertising, therefore, are gross receipts from the sale and distribution of a manufactured product, the printed advertisement, as integrated into a larger manufactured entity, the completed newspaper.

"Finally, defendant urges that a newspaper can be manufactured by one not engaged in the sale of advertising. Although a newspaper could be printed without the inclusion of advertising material, nevertheless, when it is included, as we have previously stated, it is a manufactured product.