Golden Triangle Broadcasting, Inc., Westinghouse Broadcasting Company, Inc., WIIC-TV Corporation and WKFJ FM, Inc. v. City of Pittsburgh, a municipal corporation et al., Appellants.

Argued May 4, 1977, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt. Judge Kramer did not participate in the decision.

*Grace S. Harris*, Executive Assistant City Solicitor, with her *Mead J. Mulvihill, Jr.*, City Solicitor, for appellants.

*Frank L. Seamans*, with him *Dale E. Williams*, and *Eckert, Seamans, Cherin and Mellott*, for appellees.

OPINION BY PRESIDENT JUDGE BOWMAN, September 12, 1977:

Plaintiffs, television and radio broadcasters, commenced this suit in equity[1] in the Allegheny County Court of Common Pleas, to enjoin the City of Pittsburgh (City) from collecting Business Privilege Tax[2] on their gross receipts alleging that the imposition of the tax violates their rights under the United States and Pennsylvania Constitutions and that they are not subject to the tax by reason of their being engaged in manufacturing.

After an extensive trial, including the presentation of detailed expert testimony on plaintiffs' broadcasting operations and a tour of the broadcasting facilities by the Chancellor, he concluded that the plain-

---

[1] The suit was originally brought in 1969 but, upon joint motion of the parties, was continued pending disposition of *City of Pittsburgh v. Pittsburgh Press Co.*, 14 Pa. Commonwealth Ct. 551, 322 A.2d 390 (1974).

[2] Enacted by City of Pittsburgh Ordinance No. 675 of 1968, *as amended* by Ordinance No. 594 of 1970 and No. 1 of 1975.

tiffs are engaged in manufacturing and are not, therefore, subject to the tax; consequently, he did not reach the constitutional issues raised. The City has appealed this adjudication of the Chancellor which, after consideration of the City's exceptions, was adopted by the court below en banc.

The City's Business Privilege Tax was enacted pursuant to the authority granted by The Local Tax Enabling Act (Enabling Act), Act of December 31, 1965, P.L. 1257, *as amended*, 53 P.S. §6901 et seq. Section 2 of the Enabling Act, 53 P.S. §6902, provides in pertinent part:

> The duly constituted authorities of . . . cities of the second class . . . may, in their discretion, by ordinance or resolution, for general revenue purposes, levy, assess and collect or provide for the levying assessment and collection of such taxes as they determine on persons, transactions, occupations, *privileges*, subjects and personal property within the limits of such political subdivisions. . . . Such local authorities *shall not have authority* by virtue of this act:
>
> . . . .
>
> (4) *To levy, assess and collect a tax on goods and articles manufactured in such political subdivision or on the by-products of manufacture . . . , or on any privilege, act or transaction related to the business of manufacturing . . . , by manufacturers . . . with respect to the goods, articles and products of their own manufacture. . . .* (Emphasis added.)

The issue thus presented is whether the Business Privilege Tax, as applied to plaintiffs, is a tax on a "privilege . . . related to the business of manufacturing . . . with respect to the . . . products of their own manufacture . . ."; or put simply, does broadcasting constitute "manufacturing?" This is a matter of first

impression in Pennsylvania and we are aware of only one case directly on point from another jurisdiction.[3]

We note at the outset that contrary to the impression left by the City in its citation of *Commonwealth v. Philadelphia Gas Works,* 25 Pa. Commonwealth Ct. 66, 358 A.2d 750 (1976), this case does not involve a tax *exemption* which would subject the critical statutory words to a strict construction test. *See* Statutory Construction Act, 1 Pa. C.S. §1928(b)(5). Rather, as both the Chancellor and the plaintiffs point out, the words "shall not have authority" have been construed to be a limitation on the power to tax so that doubts relating to their construction are resolved in favor of the taxpayers. *Directory Publishing Co. v. Pittsburgh,* 205 Pa. Superior Ct. 423, 425-26, 211 A. 2d 509, 511 (1965). However, we do not view this principle as of controlling significance in this case. For the issue here is whether broadcasting is "manufacturing," and, as we recently noted in *Commonwealth v. Perfect Photo, Inc.,* 29 Pa. Commonwealth Ct. 316, 321, 371 A.2d 580, 582 (1977), the difficulty with this and similar cases is the want of a statutory definition of the term "manufacturing." In the absence of such definition, either in the context of an "exemption" as in the Capital Stock Tax Act[4] or, as here, in the context of a limitation on the power to tax, the rationale for application of statutory construction principles is absent. Whether a particular activity is "manufacturing" as that term has been defined by *case law only* is purely an issue of law under

---

[3] *Commonwealth ex rel. Luckett v. WLEX-TV, Inc.,* 438 S.W. 2d 520 (Ky. 1968) held that broadcasting is not manufacturing but, for reasons expressed below, it is less than persuasive authority in this case.

[4] Act of June 1, 1889, P.L. 420, *as amended,* repealed and replaced by Article VI of The Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. §§7601-7606.

the facts of a particular case. We are, of course, mindful of our limited scope of review in equity matters and will reverse only where there is clear error or abuse of discretion or where the evidence fails to justify the Chancellor's findings and the reasonable inferences and conclusions derived therefrom. *Gruver v. Howell*, 28 Pa. Commonwealth Ct. 296, 298, 368 A.2d 920, 921 (1977).

In *Perfect Photo, supra,* we summarized the judicial efforts at defining "manufacturing" as follows:

> The word 'manufacturing' when employed in a statute or taxing measure, without further definition, consists in the application of labor and skill to material whereby the original article is changed into a new, different, and useful article. Morrisville Scrap Processing Co., Inc. Tax Appeal, 6 Pa. Cmwlth. 121 (1972), aff'd. 453 Pa. 610, 307 A.2d 905 (1973). Whether or not an article is a manufactured product depends on whether it has gone through a substantial transformation in form, qualities, and adaptability in use from the original so that a new article or creation has emerged. General Foods Corp. v. Pittsburgh, 383 Pa. 244, 118 A.2d 572 (1955). If there is merely a superficial change in the original materials without any substantial and well-signalized transformation in form, qualities, and adaptability in use, it is not a new article or new production. Commonwealth v. Berlo Vending Co., 415 Pa. 101, 202 A.2d 94 (1964).

29 Pa. Commonwealth Ct. at 321, 371 A.2d at 582-83. We also noted the aptness of Justice (now Chief Justice) EAGEN's observation in *Commonwealth v. Deitch Co.,* 449 Pa. 88, 295 A.2d 834 (1972), that:

> 'Concededly, "it is sometimes difficult to determine with legal exactness what is and what is

not manufacturing," for as one court has observed, "[i]t is easier to feel the line of distinction than to express it. . . ." ' 449 Pa. at 94, 295 A.2d at 837-38. (Citations omitted.) *Perfect Photo, supra,* at 321, 371 A.2d at 583. Nevertheless, with the above definitions in mind, we must now turn to the rather complex and technical facts of this case.

Inasmuch as the parties stipulated at trial that evidence would be limited to the operations of plaintiff Westinghouse Broadcasting Company ("KDKA," an affiliate of the Columbia Broadcasting System (CBS)) which is engaged in both television and radio broadcasting, and that the other plaintiffs' cases would be determined thereby, our discussion of plaintiffs' activities is similarly limited. In addition, we do not find it necessary to discuss, in any great detail, the radio broadcasting aspect since television broadcasting appears to include much, if not all, that is involved with radio and more. While there are no doubt great differences in the two operations to those trained in the field, we do not, for the purposes of this case, perceive any basis for a legal distinction between the two, such that one and not the other could be considered "manufacturing." Consequently, the following discussion of television broadcasting is intended to apply, by analogy, to radio broadcasting and reference will be made to the latter only when necessary.

The record reveals that KDKA's television broadcasting operations begin with what the plaintiffs refer to as pre-camera activities. These activities begin in the Program Department where the program schedule is prepared and basic decisions are made as to which programs are to be broadcast and how they are to be produced or otherwise obtained. As to programs, commercials, and other material that are to be produced in the studio, assignments are made to

producer-directors to coordinate the activities of various personnel and departments with respect to writing scripts, arranging for talent, constructing sets, arranging for studio time and crews, etc. These programs and other material are then prepared for live broadcasts or are filmed, edited, integrated with other material (*e.g.*, commercials) and placed on videotape for the actual broadcasting process.

However, only a small part of the total broadcasting time consists of programs, commercials and other materials that actually originate or are originally produced in the local studio.[5] The local news, local programs such as "Marie Torre" and various announcements, station breaks and the few studio produced commercials are the major examples. The vast bulk of the total broadcasting time consists of: (1) network programming which is transmitted to the local station over telephone lines; and (2) other materials which arrive at the station in film or videotape form such as syndicated features (*e.g.*, "That Girl," "Mike Douglas Show"), movies and virtually all commercials.[6]

How the actual process of broadcasting begins depends, to some extent, on the particular source of the material being broadcast. In the case of live broadcasts, the studio camera is the source. Light from the studio subject is focused on a photo-sensitive

---

[5] A review of the KDKA "TV Daily Program Log" for October 17, 1970, which was submitted as part of the plaintiffs' supplemental record, reveals that practically all noncommercial broadcast time is occupied by network programming, movies and films which do not originate in the studio. With respect to commercial advertisements, the record reveals that 97% are submitted to the station on film, 2% are produced by advertising agencies using the facilities of the local station, and only 1% are actually prepared by the broadcaster. These same figures with respect to KDKA radio are: 98.5% (received on transcription), .5% and 1% respectively.

[6] *See supra* n. 5.

surface in the camera and that light is transformed
from light information into an electrical signal. If the
source is film, light is projected through the film on
a photo-sensitive surface and that light is then trans-
formed into an electrical signal. The videotape
sources is played or processed through a videotape
machine which recovers audio and visual information
which has previously (in the process of making the
videotape) been reduced to an electrical signal. Fi-
nally, as mentioned, network programming arrives at
the studio over the telephone lines and is already in
the form of an electrical signal.

Thus whatever the source, the audio and visual in-
formation is either received as, or is transformed in-
to, an electrical signal. This signal is then subjected
to an extremely complex processing system involving
the studio control, master control and quality control
rooms where various adjustments are made and in-
formation from other sources is mixed and integrated.
The signal is then transformed into a microwave sig-
nal and sent to the transmitter where it is subjected
to further processing. Thereafter, the signal is im-
pressed on the broadcaster's carrier wave and the car-
rier wave is then amplified until it reaches the au-
thorized power of the particular broadcaster's chan-
nel. The signal is then sent from the transmitter to
the antenna tower where it is radiated, strikes the re-
ceiving antenna and becomes the image which is
viewed on the home television set.

The Chancellor was convinced that this process of
broadcasting which we have attempted to describe
constitutes manufacturing. The essence of this deter-
mination is expressed as follows:

> In the broadcast of a TV program, optical in-
> formation is changed into an electrical signal
> which is modified in many ways by the applica-
> tion of extremely complex technology. That

electrical signal is eventually encoded and placed on the broadcaster's carrier and sent out to be received by a receiving set, decoded and put into such a state as to be viewed by the ultimate consumer. That which occurs in the television studio before the cameras may be viewed only by those who are in actual visual contact within the television studio, and nothing is available for the benefit of the consuming public until the highly technical process of transforming optical information into an electrical signal and back has been completed by the application of skill and labor, which results in a new, different and useful product.

The Chancellor placed particular reliance on *City of Pittsburgh v. Pittsburgh Press Co.,* 14 Pa. Commonwealth Ct. 551, 322 A.2d 390 (1974), where we affirmed the lower court's determination that printing a newspaper was manufacturing[7] and further relied on *City of Pittsburgh v. WIIC-TV Corp.,* 14 Pa. Commonwealth Ct. 18, 321 A.2d 387 (1974), where we held that a television station is an "industrial establishment" within the meaning of the exclusion provided in Section 201 of The General County Assessment Law.[8] He also cited a number of other cases holding that certain activities constitute "manufacturing" within the meaning of various other statutes: *Commonwealth v. Olan Mills, Inc.,* 456 Pa. 78, 317 A.2d 592 (1974) (production of custom-made portraits);[9] *Reeve Music Co. v. Crest Records, Inc.,* 285 F.2d 546 (2d

---

[7] Actually, *Pittsburgh Press, supra,* held that the printing and circulation of the advertising content was manufacturing, the City having acknowledged the same with respect to the news content. *See Commonwealth v. J. B. Lippincott Co.,* 156 Pa. 513, 27 A. 10 (1893). There is no such dichotomy asserted in the present case.

[8] Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. §5020-201.

[9] *See also, Perfect Photo, supra.*

Cir. 1960) (production of phonographic records); *Southern Electric Light and Power Co. v. City of Philadelphia,* 191 Pa. 170, 43 A. 123 (1899) and *Commonwealth ex rel. McCormick v. Keystone Electric Light, Heat and Power Co.,* 193 Pa. 245, 44 A. 326 (1899) (production of electricity). Finally, the Chancellor distinguished *Commonwealth ex rel. Luckett v. WLEX-TV, Inc.,* 438 S.W. 2d 520 (Ky. 1968), advanced by the City and determined that the fact that plaintiffs did not produce a "tangible product" and did not sell their "product" directly to the consuming public was not controlling.

We agree with the Chancellor that *WLEX-TV, Inc., supra,* upon which the City has placed great reliance, is less than persuasive due to the Kentucky court's strict reliance upon the "common understanding" definition of manufacturing and upon case law precedents at variance with our own.[10] While the "common understanding" test does not differ from our "common and approved usage" approach to statutory construction, *see* 1 Pa. C.S. §1903(a), the latter is a vague and general standard at best. While it is technically applicable, we feel compelled to measure the facts of this case against the more specific case law definition of manufacturing to which reference has previously been made.

We further agree with the Chancellor that the fact that the plaintiffs derive their income from advertising revenues rather than direct sale of their "product" is not controlling. If a newspaper produced in the same way as that in *Pittsburgh Press, supra,* was distributed without charge, with income generated solely

---

[10] For example, the Kentucky court had previously held that publishing and printing a newspaper was not manufacturing. *City of Lexington v. Lexington Leader Co.,* 193 Ky. 107, 235 S.W. 31 (1921).

from advertising, it would nevertheless be a manufactured product.

In addition, without specifically deciding the question, we will accept the Chancellor's determination that the absence of tangibility is not controlling. This issue is of particular difficulty, both with respect to defining "tangible" and in deciding whether such a quality is required. To a large extent, tangibility seems almost inherent in the concept of manufacturing. For instance, the Enabling Act speaks of the "goods, articles and products" of manufacturing and the case law makes constant reference to the application of skill and labor to, and the combination of, "raw materials," and the changing of the original "article" into a new and different "article." Further, it is difficult, if not impossible, to think of examples of what could clearly be considered a "manufactured" intangible.

At the same time, our Enabling Act does not specifically limit manufacturing to "tangible" products and, although they are somewhat old and vague authority for the proposition, we will accept that *Southern Electric, supra,* and *Keystone Electric, supra,* hold that the production of electricity, which could be considered an intangible, is "manufacturing."

Since our ultimate resolution of this case does not turn on tangibility, we need not and do not decide this abstract and difficult issue at this time; rather, we will accept the Chancellor's determination that the tangibility factor is not controlling.

Although we have thus found some areas of agreement with the Chancellor's adjudication, we are, for the reasons that follow, unable to accept his ultimate legal conclusion and must therefore reverse.

First, we can distinguish the cases relied upon by the Chancellor and further find them to be of only limited assistance in deciding this unique and ex-

traordinary case. While we did hold a television station to be an "industrial establishment" in *WIIC-TV Corp., supra,* there is no basis for necessarily equating that term with "manufacturing." For instance, a commercial laundry has been held to be an industrial establishment although it is clearly not engaged in manufacturing. *United Laundries, Inc. v. Board of Property Assessment, Appeals and Review,* 359 Pa. 195, 58 A.2d 833 (1948). The same would apply to any number of processing or research and development facilities.[11]

Further, we do not find this case either controlled or particularly influenced by *Pittsburgh Press, supra.* Before the Chancellor, plaintiffs spent a great deal of time and testimony in an effort to show what we readily accept as true: that television and radio are, in many ways, functionally equivalent to newspapers and that they compete with newspapers for the same advertisers. However, this fact does not, in our view, compel the conclusion that broadcasting, like printing a newspaper, is manufacturing. For it is clear from *Pittsburgh Press, supra,* and *Directory Publishing Co., supra,* that a newspaper or periodical which does not own and operate its own printing presses is not a manufacturer despite the fact that it otherwise performs the identical functions and competes for the same advertisers with a newspaper or periodical that does. As the lower court stated in *Pittsburgh Press, supra,* at 557, 322 A.2d at 392:

[11] *See, e.g.,* the list of activities which comprise "processing" as that term is defined in the Capital Stock Tax Act, 72 P.S. §7602, some of which may be manufacturing and some of which may not; they all, however, would normally be conducted at an "industrial establishment." Interestingly enough, the list includes "broadcasting radio and television programs." However, the City is obviously wrong in suggesting that this precludes such broadcasting from being manufacturing since the very same clause similarly includes the publishing of books, newspapers and magazines.

In the final analysis, it is the *printing process itself,* i.e. the *combining of raw materials,* ink and paper, *into something new* (the newspaper) through the use of labor, skill and machinery which basically makes printing manufacturing.

The above quotation also serves to point out the very essence of manufacturing, that is, the "combining of raw materials . . . into something new. . . ." While each of the cases cited by the Chancellor involved, in part, technology and activities (photography, recording, newspaper publishing) similar to those involved in broadcasting, the processes therein also clearly resulted in the emergence of a new and different product that previously did not exist. For example, in *Olan Mills, supra,* sensitized paper was exposed to a color negative and combined with other elements to form a finished portrait; and in the electricity cases, skill, labor and machinery were applied to the raw materials of coal, oil or natural gas and the result was a completely different, although perhaps intangible, product—electricity.

It is this factor, the combination of raw materials into a new and different product—the very essence of manufacturing—that we find lacking here; and therein lies our fundamental disagreement with the Chancellor. For if broadcasting is manufacturing, what precisely is the "new and different product" which they themselves manufacture or make and what are the raw materials from which this "product" is derived?

It is true that the broadcasting process involves a transformation of visual and auditory information into electrical signals and microwaves. However, to say that broadcasters are thus engaged in "manufacturing" such signals and waves is but a play on words. For electrical signals and microwaves are not the

*product* but rather the *means* by which broadcasting occurs. If it can be said that there is a "product" of broadcasting at all, and we are not sure that it can, such product can only be the actual content of the various programs, commercials, and other information broadcast. Further, this content—the visual image and the audible sounds—has not, at least in the vast majority of cases, been "manufactured" by the broadcasting company at all, but has arrived at the station in its "manufactured" form—either through the network or on film or videotape supplied from sources outside the station.

That manufacturing is not involved in broadcasting, for example, network programming is illustrated by the following exchange during the cross-examination of KDKA's engineering manager:

Q. Do you do anything to that [network] signal other than take it off the telephone wire and amplify it and modulate it and send it out?

A. Quite often we do, yes.

The network signal either by the manner in which it is created or generated or whatever hazards it is exposed to in the *transportation process* to us, quite often must be what we call *reprocessed* to us, quite often must be reprocessed.

We have equipment that we call procamps, which is an abbreviation for processing amplifiers, and the function of this particular piece of equipment or pieces of equipment is *to allow us to clean up*, if you will, *this signal* that has been delivered to us. (Emphasis added.)

Record, Volume II, p. 221.

Whatever occurs in the "reprocessing," "cleaning up," "amplifying" and "modulating" of the network signal, we are satisfied that it constitutes neither a "manufacturing" of that signal or of the resulting

image that appears on the home television set. Further, we view the process by which the signal is sent from the broadcaster to the home as not unlike the way that the witness viewed its transmission from the network to the station—that is, as essentially a "transportation process."

Broadcasting is therefore, in our view, simply a process of transporting or transmitting by electrical signals and microwaves, visual images and sounds to home viewers and, as such, is more analogous to the provision of a service than the manufacture of a product. In this respect, we agree with the statement in *WLEX-TV, Inc., supra,* that:

> In the last analysis, the function of television is to transmit a message or communication. It manufactures messages in about the same sense that a common carrier manufactures travel.

438 S.W. 2d at 523.

We readily acknowledge the complexity and sophistication of the skill, technology and equipment used in the broadcasting process but this alone cannot simply overwhelm or confound us into the conclusion that manufacturing has occurred. As our Supreme Court stated in *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 116, 69 A.2d 405, 408-9 (1949):

> Nor is it of legal significance in this connection that the operations thus conducted require large and extensive plants and organizations, trained men and intricate machinery, for even though the labor be skilled, the operation delicate, a large plant involved, and expensive machinery utilized, such factors, neither individually nor collectively converted what is essentially a mere processing operation into a manufacturing one: Cf. Rieck McJunkin Dairy Co. v. Pittsburgh School District, 362 Pa. 13, 23 66 A.2d 295, 299.

Nor are we as impressed as the Chancellor with the fact that, without broadcasting, the particular images and sounds would only be visible and audible to those physically present at the station. This does not alter and, in fact, serves to emphasize our view that the essential function of broadcasting is the *transmission* rather than the *manufacture* of visual and sound information. While broadcasting certainly makes that information more useful and usable, there are many processing functions that do likewise but do not result in the manufacture of a product.[12]

Of course, the above analysis does not completely account for the limited amount of television broadcasting time which does, in fact, consist of images and sounds which originate live or are originally recorded in the studio. However, we are likewise persuaded that this element does not render that portion of the plaintiffs' activities "manufacturing."

First, with respect to what plaintiffs have called "pre-camera activities" (described above), we note that with the exception of the actual live production or taping of a program, these activities are not significantly different from the planning, organizational, administrative and operational activities of any number of large business enterprises, and not necessarily those of a manufacturer. While elements of manufacturing are involved (*e.g.*, construction of a set), this is, in our view only incidental to the broadcaster's essential function.[13]

---

[12] *See, e.g., Commonwealth v. Tetley Tea Co.,* 421 Pa. 614, 220 A.2d 832 (1966) ; *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 69 A.2d 405 (1949) ; *Commonwealth v. Babcock Lumber Co.,* 1 Pa. Commonwealth Ct. 45, 272 A.2d 522 (1971).

[13] Large retailers routinely construct such "sets" and displays for the purpose of exhibiting their merchandise but that does not make that activity "manufacturing."

However, in a broader sense, the combination and interaction of the various activities which go into producing, for example, the local news program, do present a compelling example of what could reasonably be construed to be manufacturing. We are impressed with the plaintiffs' description of a typical "news day" including the making of assignments to reporters and film crews; the actual process of "gathering" news—interviewing, filming and recording; the arrival back at the station of raw data—information, exposed film, written reports, etc.; and the complex process of developing, printing, editing, refining and integrating the various data into what we complacently view as the local news program. Further, there is an appealing ring to plaintiffs' argument that they combine and transform "talent, information, news, events, film, tape, art work, graphics, entertainment and electronic materials into the final visual and/or sound product."

However, as impressive as this process is, we cannot, with respect to what actually occurs on the studio set, distinguish it from that involved, for example, in an elaborate theatre or musical production, an activity that no one would seriously contend constitutes "manufacturing." For the production of a play similarly involves planning and organizational functions, set and costume design and fabrication, as well as the "combining" of talent, script, entertainment, art work, recorded or live music and sound effects, etc. into a final product—the actual performance. And if what actually occurs in the studio is not manufacturing, it is not made so by its electronic transmission to viewers at home; for this transmission process is, as discussed above, in our view, simply a transporting of images and sounds and not their manufacture.

All that we have said above applies with equal force to radio broadcasting. To the extent that it consists of the broadcast of music, commercials and other in-

formation that has previously been recorded, it is analogous to television broadcasts of network programs and other features whose source is film or videotape. To the extent that it consists, as most radio broadcasting time does, of "live" broadcasts of the announcer or disc jockey's voice, news and weather programs, talk shows, etc., it is analogous to "live" television broadcasting. For example, if, as is frequently done, a disc jockey is hired to perform as announced or "emcee" and to play records at a dance, such performance and playing of records does not constitute manufacturing. The fact that he performs the identical function in a broadcasting studio and his voice is thus broadcast to a much larger audience does not, in our view, alter its essential character.

This is a close and difficult case and one that practically defies strict legal analysis. The result perhaps turns more on what is perceived as the essence and inherent meaning of words than on the simple application of legal principles and definitions. As noted at the beginning, this is an area where the distinctions are easier to "feel" than to express. Nevertheless, we are persuaded that the process of radio and television broadcasting, while an invaluable service involving complex and sophisticated skills, technology and equipment, is, in the final analysis, simply a means of transporting or transmitting images and sounds rather than a "manufacture" of such images and sounds as that term was intended by the Legislature and is defined by the courts.

Judge KRAMER did not participate in the decision in this case.

ORDER

Now, September 12, 1977, the order of the lower court is reversed and the case is remanded for further proceedings as to issues raised but undisposed of by the Chancellor in his adjudication.

DISSENTING OPINION BY JUDGE ROGERS:

I respectfully dissent.

In *City of Pittsburgh v. Pittsburgh Press Co.*, 14 Pa. Commonwealth Ct. 551, 322 A.2d 390 (1974), we held that the production of a newspaper was manufacturing. In *Commonwealth v. Olan Mills, Inc. of Ohio*, 456 Pa. 78, 317 A.2d 592 (1974), the Supreme Court held that the making of custom-made photographic portraits was manufacturing. In *City of Pittsburgh v. WIIC-TV Corp.*, 14 Pa. Commonwealth Ct. 18, 321 A.2d 387 (1974), we held that a television station was an industrial establishment. Yet the majority in this case, although expressly accepting the proposition that The Local Tax Enabling Act does not limit manufacturing to tangible products, holds that the production of radio and television programs is not manufacturing because radio and television stations do not combine raw materials, such as ink and paper in the newspaper case and sensitized and negative paper in the photograph case, into a new and different product. Thus the majority seems to say that the end product of manufacturing may be intangible only if the raw materials are tangible, with the result that the production of liquids from gasses would not be manufacturing but the production of gasses from liquids would.

The majority asks: "For in broadcasting, what precisely is the 'new and different product' which they themselves manufacture or make and what are the raw materials from which this 'product' is derived?" The answers come readily to mind. The new and different product is the station's radio or television programming, consisting of entertainment, news, opinion and advertising—a product identical to a newspaper except that the former is to be listened to or seen rather than read. The raw materials of broadcasting are electronic signals, capable of being converted to sound or light, some produced by the station, some

provided by other stations or networks, some supplied by advertisers, but all combined by the labor, skill and the machinery of the broadcaster into something new, a program. Having decided that the production of a newspaper is manufacturing, we must, it seems to me, if we are to be consistent, decide that the production of radio and television programs is also manufacturing.

Judge CRUMLISH, JR. joins in this dissent.