IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**


| | | |
|---|---|---|
| S & H TRANSPORT, INC., | : | No. 17 MAP 2015 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court dated October |
| | : | 15, 2014 at No. 165 CD 2014 Reversing |
| v. | : | and Remanding the Order of the York |
| | : | County Court of Common Pleas, Civil |
| | : | Division, dated January 6, 2014 at No. |
| CITY OF YORK, | : | 2012-SU-004143-54. |
| | : | |
| Appellee | : | ARGUED: November 17, 2015 |
| | | RESUBMITTED: January 20, 2016 |


<u>OPINION</u>

**JUSTICE DONOHUE**                                    **Decided: May 25, 2016**

In this appeal, we are asked to determine whether freight brokerage services are excepted from local business privilege taxation[1] under the "public utility" exception found in Section 301.1(f)(2) of the Local Tax Enabling Act ("LTEA"), Act of December 31, 1965, P.L. 1257, *as amended*, 53 P.S. § 6924.301.1(f)(2).  The Commonwealth

---

[1]  City of York's ("City") Business Privilege Tax is a tax on the privilege of doing business in the City.  Persons desiring to do business in the City are required to obtain a business privilege/mercantile license and pay a tax on gross receipts.  City of York Business Privilege and Mercantile Tax Ordinance ("Ordinance") §§ 343.01-343.99.  The business privilege tax is imposed at a rate of three and one-half mills or three dollars and fifty cents per one thousand dollars of gross volume of business.  Ordinance, § 343.02(a).  In the underlying litigation, S & H Transport, Inc. ("S&H") raised a number of challenges to the City's business privilege tax assessment, including the taxability of S&H and the inclusion of certain amounts in gross receipts (e.g., amounts not attributable to activities within the City and amounts that S&H did not retain but paid to the freight carriers). In this appeal, we address only whether the City is barred from imposing a business privilege tax under the "public utility" exception.

Court concluded that S&H was not excepted. We affirm the Commonwealth Court's decision because we conclude that the rates of the common motor carriers with whom S&H does business are not fixed and regulated by the Pennsylvania Public Utility Commission ("PUC"), and thus the entire exception is inapplicable.

The facts are not in dispute. S&H is an intrastate, interstate and international freight broker headquartered in the City. S&H receives freight shipment orders from manufacturing customers and then negotiates contracts for carriage with licensed common carriers which are public utilities[2] and regulated by the PUC. According to S&H's controller, it is the middleman between the customer and the carriers. S&H invoices its customers for payment. The payment includes the charges it negotiates with the carrier for the utility service (cost of shipment) together with taxes and fees. S&H then remits payment to the common carrier and retains the freight brokerage commission. Because it collects the entire balance, S&H's records include the gross receipts from freight shipment transactions before payment is made to the carriers. As

---

[2] The Public Utility Code, ("PUC Code"), 66 Pa.C.S.A. § 102, defines "public utility" as "(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for: … (iii) Transporting passengers or property as a common carrier." In turn, "common carrier" is defined as:

> Any and all persons or corporations holding out, offering, or undertaking, directly or indirectly, services for compensation to the public for the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by, through, over, above, or under land, water, or air, and shall include forwarders, but shall not include contract carriers by motor vehicles, or brokers, or any bona fide cooperative association transporting property exclusively for the members of such association on a nonprofit basis.

Id. Because the definition of "common carrier" excludes brokers, S&H is not itself a public utility.

a result, the gross receipts do not include deductions for the shipment costs. *See* Stipulation of Uncontested Facts, 12/10/13, ¶¶ 2, 4 6-7.

Section 301.1 of the LTEA, 53 P.S. § 6924.301.1(a.1)(1), authorizes political subdivisions to levy a tax on the privilege of doing business in the jurisdiction of the local taxing authority. Section 301.1(f) of the LTEA, however, prohibits local authorities from collecting or levying any taxes on certain types of goods and transactions enumerated in sixteen subsections. The "public utility" exception, at issue here, is found in Section 301.1(f)(2) of the LTEA:

(f) Such local authorities shall not have authority by virtue of this act:

\* \* \*

(2) To levy, assess or collect a tax on the gross receipts from utility services of any person or company whose rates and service are fixed and regulated by the Pennsylvania Public Utility Commission or on any public utility services rendered by any such person or company or on any privilege or transaction involving the rendering of any such public utility service.

53 P.S. § 6924.301.1(f)(2).[3]

---

[3] Section 204(D)(3) of the City's Business Privilege and Mercantile Rules and Regulations ("Regulations") and Section 343.02(c)(3) of the City's Ordinance also contain a virtually identical provision excepting "utilities" from the business privilege tax. The pertinent provision of the City's Ordinance states:

Utilities. No such tax shall be assessed and collected on the gross receipts from utility service of any person or company whose rates of service are fixed and regulated by the Pennsylvania Public Utility Commission, or on any public utility service rendered by any such person or company or on any privilege or transaction involving the rendering of any such public utility service.

Ordinance, § 343.02(c)(3).

For the years 2007 through 2011, S&H filed business privilege tax returns with the City. S&H paid the annual $25 Business Privilege and Mercantile License fees.[4] S&H did not report any income to the City for business privilege tax purposes for those years, however, because it believed it fell within the "public utility" exception in Section 301.1(f)(2) of the LTEA.[5]

In November 2011, the City conducted an audit of S&H's business privilege tax returns. The City assessed a business privilege tax on S&H's gross receipts in the amount of $118,346.88 for the years 2007-2011. S&H appealed and the tax-assessment appeal hearing officer upheld the City's assessment following a hearing.

S&H appealed to the trial court, arguing that pursuant to Section 301.1(f)(2) of the LTEA, the City was not authorized to assess or collect the business privilege tax. S&H argued, and the City agreed, that Section 301.1(f)(2) of the LTEA contains three clauses, each of which creates a distinct exception. S&H claimed that it fell within the third clause because it derives its gross receipts from transactions that involve the rendering of a public utility service, namely the interstate and intrastate[6] shipment of goods by licensed common carriers regulated by the PUC. S&H asserted that it participates in, or is "involved" in, the "rendering" of the public utility services provided by common carriers because it negotiates the carrier's charges, it collects from the shipper the carrier's charges, it transmits the charges to the carrier, and the amount S&H invoices its customer includes the actual charge for the services being provided by

---

[4] *See* Section 102 of the Regulations.

[5] The City's Regulations require the filing of a business privilege tax return whether or not tax is due. Regulations, § 202.

[6] Intrastate trucking involves the picking-up and dropping-off of shipments where both the origin and destination are in Pennsylvania. The PUC is the Pennsylvania authority that regulates intrastate trucking.

the carrier. S&H also emphasized that it pays taxes on freight shipments and is regulated by the PUC through its registrations with the Federal Motor Carrier Safety Administration (FMCSA)[7] and the Unified Carrier Registration (UCR).[8] The City conversely emphasized that S&H acts only as the "middleman" between shippers and the carriers and is neither a common carrier nor a public utility. According to the City, the common carrier itself, rather than the freight broker, is the party directly "involved" in the "rendering" of the public utility service.

After a non-jury trial, the trial court concluded that it was "clear and unambiguous" that S&H's gross receipts were "tax exempt"[9] under the third clause of

---

[7] S&H holds a freight brokerage license issued by the FMCSA.

[8] Pennsylvania, through the PUC, participates in the federal Unified Carrier Registration Act ("UCR Act"), 49 U.S.C. § 13901. The UCR Act applies, inter alia, to freight brokers. Section 14504a of the UCR Act requires filing with the PUC information relating to financial responsibility and its local agent for service of process.

[9] The trial court's use of the word "exempt" here is incorrect. As we explained in Lynnebrook and Woodbrook Associates, L.P. v. Borough of Millersville, 963 A.2d 1261 (Pa. 2008), our jurisprudence distinguishes between the concepts of a tax **exemption** and a tax **exception**:

> Where we determine the breadth of a taxing statute - whether a taxing authority is permitted by law to levy a particular tax - we consider whether a tax exception exists, and the presumption is in favor of the taxpayer. 1 Pa.C.S.A. §1928(b)(3). By contrast, where we determine whether a person or property fits under a statutory provision enumerating exemptions from such taxing authority, we consider whether a tax exemption exists, and the presumption is in favor of the taxation authority. 1 Pa.C.S.A. §1928(b)(5).

Id. at 1265.

The authority to tax, granted under Section 301.1(a) and (a.1) of the LTEA, is expressly limited by Section 301.1(f)(2). This statutory language, which acts to restrict the power of the taxing authority, must be construed as a tax exception — not a tax exemption. Any reasonable doubt concerning the meaning of statutory language involving an exception is resolved in favor of the taxpayer. Lynnebrook, 963 A.2d at 1265.

Section 301.1(f)(2) of the LTEA. Trial Court Opinion, 2/27/14, at 4. According to the trial court, S&H "collected gross receipts on transactions involving the rendering of any such public utility service" since the property carriers S&H used to transport freight are public utilities.[10] Id.

In a published decision authored by President Judge Pellegrini and joined by Judge Leadbetter, the Commonwealth Court reversed the trial court's order and remanded for further proceedings. The majority initially noted that Section 301.1(f)(2) of the LTEA "generally prevents local governments from taxing subjects involved in the rendering of public utility services." S & H Transport, Inc. v. City of York, 102 A.3d 599, 601 (Pa. Cmwlth. 2014). It found that the first clause -- "[t]o levy, assess or collect a tax on the gross receipts from utility service of any person or company whose rates and services are fixed and regulated by the Pennsylvania Public Utility Commission" -- prohibits a tax on the utility as measured by gross receipts. Id. at 601. The second clause -- "on any public utility services rendered by any such person or company" -- prohibits a local government from imposing a tax on the customer, as measured by the amount billed to the customer for the services. Id. Finally, with respect to the third clause, -- "any privilege or transaction involving the rendering of any such public utility service" -- the majority viewed the issue as "whether this clause applies only to prohibit levying a business tax on the public utility for the privilege of engaging in public utility services or whether it extends to all parties that engage in the business of buying public utility services." Id. at 601-02.

Addressing that question, the majority observed that the entity "rendering" the public utility service is the one that transmits, delivers or furnishes transportation of

_____

[10] In light of its holding, the trial court did not consider S&H's other issues.

property, which the majority described as the "hallmark" of public utility service as a common carrier. Id. at 602-03. S&H negotiates a price to facilitate the transportation of the shippers' goods to provide better rates, but does not itself transmit, deliver or furnish transportation of any property. Id. As a result, affording the words "involve" and "render" their plain and ordinary meaning, the majority concluded that S&H was not "involved" in the "rendering" of "any public utility service." Id. Judge Leadbetter joined President Judge Pellegrini's opinion, but wrote separately to explain that because the rates of the common carriers contracted by S&H are not "fixed and regulated" by the PUC, S&H does not qualify for an exception under the third clause of Section 301.1(f)(2), as the reference in that clause to "such public utility service" refers to the public utility services described in the first clause of that provision. Id. at 603 (Leadbetter, J., concurring).

Judge Simpson dissented, indicating that "the words 'shall not have authority' have been construed to be a limitation on the power to tax so that doubts relating to their construction are resolved in favor of the taxpayers." Id. at 604 (Simpson, J., dissenting) (quoting Golden Triangle Broad, Inc. v. City of Pittsburgh, 377 A.2d 839, 842 (Pa. Cmwlth. 1977) (en banc), aff'd, 397 A.2d 1147 (Pa. 1979)). Judge Simpson insisted that the majority's construction of the word "involved" in the third clause was too narrow, and that S&H, whose revenues were derived solely from freight delivery by carriers regulated by the PUC, was thus "involved" in the "rendering" of public utility services. Id. at 604-605. (Simpson, J., dissenting). Finally, Judge Simpson disagreed with Judge Leadbetter's contention that the reference to "such public utility service" in the third clause refers to the public utility services described in the first clause. Instead, Judge Simpson would have applied the last antecedent rule, pursuant to which "courts should generally apply qualifying words to the words immediately preceding them, not to

other words, phrases or clauses more remote." Id. at 605 n.2 (Simpson, J., dissenting) (quoting 1 Pa.C.S.A. § 1903(b); Commonwealth v. Packer, 798 A.2d 192 (Pa. 2002)). Applying the last antecedent rule, Judge Simpson would have found that the term "such" in the third clause refers to the phrase "any public utility service" in the second clause, "not to remote language in the *first* clause." S & H Transport, 102 A.3d at 605, n. 2 (Simpson, J., dissenting).

In a footnote, the majority disagreed with Judge Simpson's focus on the word "involved," reasoning that if this interpretation was accepted, "all truck stops could not be taxed because they are 'involved' in public utility services because they supply the trucks with gas." Id. at 603 n.10. The majority further reasoned that because brokers are specifically excluded from the definition of a "common carrier" in the PUC Code, 66 Pa.C.S. § 102, S&H is, "by definition, not so involved." S & H Transport, 102 A.3d at 603 n.10. The majority also rejected Judge Simpson's position that the term "such" in the third clause refers to the "services" in the second clause. Id. ("[B]ecause the PUC no longer regulates 'the rates and services' of trucking companies … if [Judge Simpson's] interpretation is adopted, that would lead to the anomalous result that freight brokers would not be subject to the tax but trucking companies would be.").

This Court granted allocatur to consider the following issues presented by S&H:

> (1)   Whether the City [of York] may include, in its tax assessment on [S&H], gross receipts from freight-brokerage services provided to entities engaged in public utility services that are [excepted] from the City's Business Privilege Tax because those entities are regulated by the Pennsylvania Public Utility Commission?
>
> (2)   Whether entities whose rates were once, but are no longer, regulated by the Pennsylvania Public Utility Commission still enjoy the [exception] from Municipal taxation articulated in 53 P.S. § 6924.301.1(f)(2)?

S & H Transp., Inc. v. City of York, 111 A.3d 169 (Pa. 2015) (per curiam).

S&H argues that the Commonwealth Court incorrectly determined that S&H was not "involved" in the "rendering" of "public utility" services. Initially, S&H claims that in the intermediate court, neither party raised, argued or briefed the question of whether S&H was "involved" in the "rendering" of "public utility" service. It contends that, to the contrary, the parties tacitly agreed that S&H was involved in the rendering of non-rate regulated common carrier services. S&H claims that since "public utility" is not defined in the LTEA, the exception from local taxation in the LTEA must be read in pari materia with the policy objectives expressed in the provisions of the PUC Code. 1 Pa.C.S.A. § 1932. Reading Section 301.1(f)(2) in pari materia with Section 2501(a) of the PUC Code, S&H contends that freight brokers are unquestionably "involved" in the "rendering" of public utility services.[11]

---

[11] Section 2501(a) of the PUC Code provides, in relevant part:

> **(a) Declaration of policy.**-- … It is hereby found as a fact, after due investigation and deliberation, that the service of common carriers by motor vehicle, forwarders, contract carriers by motor vehicle, and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of passengers or property over the highways, are so closely interwoven and interdependent, and so directly affect each other, that in order effectively to regulate such common carriers by motor vehicle and forwarders, and to provide a proper and safe highway transportation system in the public interest, it is necessary to regulate the service of such contract carriers by motor vehicle and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of passengers or property over the highways, in the manner set forth in this chapter.

66 Pa.C.S. § 2501(a).

Next, S&H urges that the "public utility" exception in Section 301.1(f)(2) is not limited to rate-regulated public utilities.[12] Embracing Judge Simpson's application of the last antecedent rule, S&H submits that the term "such" in the third clause refers to the phrase "any public utility service" in the second clause. Accordingly, S&H's preferred interpretation of Section 301.1(f)(2) would provide an exception from local taxation in three circumstances: where gross receipts are derived from a utility service whose rates of service are fixed and regulated by the PUC; where gross receipts are derived from any public utility service rendered; or where gross receipts are derived from any privilege or transaction involving the rendering of any public utility service.

In response, the City supports the Commonwealth Court's focus on the words "involved," "render" and "public utility" as restricting the scope of the exception in the third clause of Section 301.1(f)(2). The City asserts that the Commonwealth Court correctly concluded that the entity that renders the public utility service is the one that transports the goods, and that because S&H does not participate in the actual transportation of goods, it is not involved in the rendering of public utility service. Finally, the City insists that even if S&H is involved in the rendering of a public utility service, S&H still does not qualify for the "public utility" exception under the second or third clauses because the rates it negotiates and charges its customers are not fixed and regulated by the PUC. Under the City's preferred interpretation of the Section

---

[12] S&H points to Ernest Renda Contracting, Co., Inc. v. Commonwealth, 532 A.2d 416 (Pa. 1987), a case in which this Court held that the "public utility" exception to the Commonwealth's "use tax" under 72 P.S. § 7201(o)(4) extended to municipal utilities even though such entities are not, in a strict sense, a public utility regulated by the PUC. S&H suggests that Section 301.1(f)(2) of the LTEA follows this line of thought when it uses the phrase "any public utility service." S&H contends that the word "any" in the second clause covers a separate legislatively defined class of services held out to the public without necessarily being the subject of PUC rate regulation.

301.1(f)(2) exception, an entity must be a public utility whose rates are fixed and regulated by the PUC.

As this case presents issues of statutory interpretation, they are questions of law over which our review is plenary and de novo. Fish v. Township of Lower Merion, 128 A.3d 764, 769 (Pa. 2015). The Statutory Construction Act, 1 Pa.C.S.A. §§ 1501-1991, makes clear that the "polestar" of construction is determining the intent of the legislature. Griffiths v. WCAB (Seven Stars Farm, Inc.), 943 A.2d 242, 254 (Pa. 2008); 1 Pa.C.S.A. § 1921(a). When the language of the statute is clear, that language is dispositive of legislative intent and thus vitiates the need for further interpretation. *See* 1 Pa.C.S.A. § 1921(b). Statutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things. 1 Pa.C.S.A. § 1932(a). In construing the language within a statute, we must give effect to every word of the statute. 1 Pa.C.S.A. § 1922(2); American Airlines, Inc. v. Commonwealth, Board of Finance and Review, 665 A.2d 417 (Pa. 1995); *see generally* Commonwealth v. Ostrosky, 909 A.2d 1224, 1232 (Pa. 2006) (citing Holland v. Marcy, 883 A.2d 449, 456 (Pa. 2005) (plurality) ("[W]e cannot assume that the legislature intended any words to be mere surplusage.")).

This case involves the interpretation of a statutory exception from local taxation for public utilities found in Section 301.1(f)(2) of the LTEA which, as noted above, provides as follows:

(f) Such local authorities shall not have authority by virtue of this Act:

\* \* \*

(2) To levy, assess or collect a tax on the gross receipts from utility services of any person or company whose rates and service are fixed and regulated by the Pennsylvania Public Utility Commission or on any public utility services rendered by any such person or company or on any privilege or

transaction involving the rendering of any such public utility
service.

53 P.S. § 6924.301.1(f)(2).

As developed, S&H is claiming the exception as a freight broker that negotiates contracts for carriage with licensed common carriers. These carriers are regulated by the PUC and defined as public utilities under the PUC Code. Common carriers are regulated under the PUC Code in varying degrees. Broadly speaking for the purpose of our analysis, there are two categories of common carriers: those whose rates are regulated by the PUC and those whose rates are not regulated by the PUC.

Passenger carriers (with a seating capacity of fifteen or more) and carriers of household goods in use (moving companies), both of which deal directly with the consuming public, are regulated regarding rates, geographical area, customer service, safety and insurance. Passenger carriers and household goods carriers must file a tariff specifying their applicable rates and charges, and must seek PUC approval for any change in rates. 52 Pa. Code § 3.381(e). On the other hand, common carriers of property (trucking companies) are regulated for safety and insurance requirements only. Property carriers are not required to file a tariff and thus, their rates are not fixed and regulated by the PUC.[13] *See* 52 Pa. Code § 23.1(b) ("This Chapter [relating to Tariffs of Common Carriers] applies to motor carriers except common carriers of property.").

The parties to this action agree that the common motor carriers for which S&H provides freight brokerage services are property carriers, i.e., shippers of manufactured

---

[13] The rates of property carriers were once, but are no longer, fixed and regulated by the PUC. *Cf.* Andrew Downer Crain, *Ford, Carter, and Deregulation in the 1970s*, 5 J. Telecomm. & High Tech. L. 413, 415-37 (2007) (providing a comprehensive overview of the efforts of Presidents Ford and Carter to deregulate the transportation industry, and noting the growing consensus at the time that both the industry and consumers would benefit from deregulation).

goods and property other than household goods. As such, they are common carriers that are non-rate regulated public utilities. While their service is regulated by the PUC, their rates are not fixed and regulated.

Turning to interpretation of the statute, we find that Section 301.1(f)(2) is clear and unambiguous. Excepted from local taxation under the first clause are: "gross receipts from utility service of any person or company whose rates and services are fixed and regulated by the Pennsylvania Public Utility Commission." 53 P.S. § 6924.301.1(f)(2). To fall within the ambit of the first clause of Section 301.1(f)(2), the person or company's rates and services must be fixed and regulated by the PUC. The common motor carriers with whom S&H does business (property carriers) do not fall within the scope of the first clause of Section 301.1.(f)(2) because their rates are not fixed and regulated by the PUC. The City is not barred from imposing local business privilege taxes on them.

The second clause provides an exception from local taxation on "services rendered **by any such person or company**." Id. (emphasis added). It is clear to this Court that the phrase "any such person or company" refers back to the person or company "whose rates and services are fixed and regulated" by the PUC in the first clause. The use of the word "such" in the second clause requires the reference back to the first clause, where "such person or company" is described. *See, e.g.*, Commonwealth v. McClintic, 909 A.2d 1241, 1250 (Pa. 2006) (the word "such,' a demonstrative adjective, "refers to an antecedent, or a category of things previously mentioned.").[14] Thus, under the second clause, the City is prohibited from taxing any

---

[14] In In re Brock, 166 A. 785 (Pa. 1933), this Court examined the adjective "such" in a statute that began: "In case of the insolvency of any such individual, partnership, or unincorporated association, acting as a private banker… ." Id. at 787. Appellants in that case argued that this phrase referred to *any* individual or partnership. This Court (continued…)

services rendered by a person or company whose rates and service are fixed and regulated by the PUC. If, as S&H argues, the second clause was intended to apply to any public utility service (whether rate-regulated or not), the word "such" would constitute mere surplusage.

The third clause, principally at issue here, prohibits local taxation of "any privilege or transaction involving the rendering **of any such public utility service**." 53 P.S. § 6924.301.1(f)(2) (emphasis added). Again it is clear that word "such" in the phrase "any such public utility service" refers to the "services" described in the second clause -- which, in turn, refers to the persons or companies identified in the first clause, i.e., those whose rates and service are fixed and regulated by the PUC. As a result, the third clause provides an exception from local taxation for any transaction or privilege involving the rendering of public utility services that are provided by a person or company whose service and rates are fixed and regulated by the PUC. Because the rates of the freight carriers with which S&H contracts are not fixed and regulated by the PUC, S&H may not benefit from the exception in the third clause regardless of whether

---

(…continued)

disagreed, stating that to ignore the word "such" was "to affront both grammar and public policy." Id. at 788. The Court explained further:

> 'Such' i.e., 'that kind' of individual, partnership, etc., as used in that sentence can mean only the individual, etc., who has been duly licensed as a private banker. If the word 'such' does not mean that, it has no place or purpose whatever in the act. If the sentence quoted means what appellants contend it means, the word 'such' is entirely superfluous and should be deleted so that the sentence would read: 'In case of the insolvency of any individual,' etc., 'acting as a private banker,' etc. For us to delete a word from an act so as to give it a different meaning is for us to engage in legislation.

Id. at 787-88.

it is "involved in the rendering" of such service. As a result, we need not decipher the meaning of that statutory phrase.

With respect to common motor carriers, the various exceptions from local taxation in all three clauses of Section 301.1(f)(2) apply only if a common motor carrier's rates and services are fixed and regulated by the PUC. In our view, this interpretation is both the product of a straightforward application of the rules of statutory interpretation and, importantly, consistent with the primacy of the PUC's rate-making authority. Balancing the needs of consumers and utilities, the PUC Code authorizes the PUC to fix the rates and charges for every public utility and requires that those rates and charges be "just and reasonable." 66 Pa.C.S.A. § 1301. To that end, Section 1303 of the Public Utility Code provides that no public utility shall, "directly or indirectly," receive "a greater **or less** rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto." 66 Pa.C.S.A. § 1303 (emphasis added).[15] If local taxing authorities were permitted to tax rate-regulated services, the providers of those services would effectively receive rates lower than those specified in their filed tariffs. While one obvious purpose of the LTEA is to permit

---

[15] Section 1303 provides:

> No public utility shall, directly or indirectly, by any device whatsoever, or in anywise, demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto. The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part. Any public utility, having more than one rate applicable to service rendered to a patron, shall, after notice of service conditions, compute bills under the rate most advantageous to the patron.

66 Pa. C.S.A. § 1303.

local taxing authorities to impose business privilege taxes, the exceptions in Section 301.1(f)(2) are intended to provide an appropriate limitation to eliminate any interference with the PUC's rate-making authority.

In its second issue, S&H contends that the Commonwealth Court's holding, which resulted in the application of the exception to only rate-regulated common carriers, contains an implicit assertion that the "public utility" exception of the LTEA has been repealed as the result of rate deregulation. S&H states:

> When the Pennsylvania Legislature wrote the LTEA, there is perhaps no way they could have foreseen the changes that have taken place in the industries considered public utilities over the past four decades. However, the Legislature has treated these ancillary entities as though they are exempt from taxation ever since deregulation began to make headlines in the 1970s. The Legislature has had ample opportunity to change Section 301.1(f)(2) of the LTEA if they believed that a change was necessary, and have not done so. Accordingly, the holding of the Commonwealth Court contains an implied assertion that the Public Utility Exemption [sic] provision in the LTEA has been impliedly repealed as the result of rate deregulation. Specifically, the provisions of the Public Utility Code, 66 Pa.C.S. § 102, which define public utility services broadly, and Section 301.1(f)(2)[,] which prohibits the local taxation of receipts derived from the rendering of public utility services[,] would be significantly altered based solely on the change in circumstances surrounding the nature of public utility regulation.

Brief of S&H at 22-23.

S&H's argument lacks merit. Nothing in the LTEA suggests that a person or company whose rates were **once** regulated by the PUC is forever shielded from local taxation. As discussed, the language of the public utility exception of the LTEA is clear. Only persons or companies whose rates are fixed and regulated by the PUC are excepted from local taxation, along with the services of such public utility and the transactions and privileges involving such public utility services. If, for whatever reason,

such as deregulation, the PUC no longer fixes and regulates that person or company's rates, then that person or company is not entitled to the benefit of the exception from local taxation.

The order of the Commonwealth Court is affirmed.